**DELTA STEAMSHIP LINES, INC.,**
**Plaintiff-Appellant,**

v.

**AVONDALE SHIPYARDS, INC., et al.,**
**Defendants-Appellees.**

No. 82–3625.

United States Court of Appeals,
Fifth Circuit.

Dec. 3, 1984.

Opinion on rehearing, 5th Cir., 753 F.2d 378.

Robert S. Reich, Edward S. Bagley, New Orleans, La., for plaintiff-appellant.

Curtis R. Boisfontaine, New Orleans, La., for DeLaval.

A.R. Christovich, Jr., C. Edgar Cloutier, New Orleans, La., for Zurn.

Before CLARK, Chief Judge, BROWN, and HIGGINBOTHAM, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

This appeal[1] requires this Court to make another trek through "[t]hat Serbonian Bog"[2] of damages in maritime cases. Before us are claims for detention damages, replacement costs, general average processing expenses, and attorneys' fees sought from DeLaval Turbine, Inc., Avondale Shipyards, Inc., and Zurn Industries, Inc. and the trial court's dismissal of Avondale Shipyards, Inc. Because we find that the trial court erred in its method of calculating detention damages and failed to award damages for cost of replacement of the couplings, we reverse as to DeLaval and Zurn. We affirm, however, the trial court's dismissal of Avondale, its denial of general average processing expenses and attorneys' fees.

### Delta Strikes Out

Delta Steamship Lines, Inc. (Delta) operates liner services between ports in the Gulf of Mexico and South America and West Africa. The Gulf-West Africa trade is conducted through conventional vessels which carry break-bulk cargo, but the Gulf-South American routes are serviced by LASH[3] vessels which were constructed for Delta by Avondale Shipyards, Inc. (Avondale). On September 30, 1977 Delta's LASH vessel DELTA NORTE sailed from the Port of New Orleans bound for various South American ports. While en route on October 8, 1977, a low pressure, high speed flexible coupling in the vessel's main propulsion equipment failed and the vessel was disabled. The propulsion equipment was supplied to Avondale by DeLaval Turbine, Inc. (DeLaval), and the coupling was supplied to DeLaval by Zurn Industries, Inc. (Zurn).

The disabled DELTA NORTE was towed to Oranjestad, Aruba, and its cargo was transferred to the conventional-designed

---

1. The trial court's opinion is found at 1983 A.M.C. 2814. Reference will be made to various pages.

2. *Culver v. Slater Boat Co.*, 688 F.2d 280, 299 n. 24, 1983 A.M.C. 2251, 2277 n. 24 (5th Cir.1982) (en banc), *rev'd,* 722 F.2d 114 (5th Cir.1983) (en banc), *cert. denied,* — U.S. —, 105 S.Ct. 90, 83 L.Ed.2d 37 (1984).

3. LASH is an acronym for lighter aboard ship. A LASH vessel—a sort of seagoing kangaroo—is

an ocean vessel designed to lift on board and carry specially designed barges which are fully loaded with cargo. *Wirth, Ltd. v. S/S ACADIA FOREST,* 537 F.2d 1272, 1274, 1976 A.M.C. 2178, 2180 (5th Cir.1976). The barges are loaded at remote points on inland rivers or other waterways which are inaccessible to deep draft ocean vessels. The barges are then towed from inland ports to the deep water port where they rendezvous with the ocean vessel and are loaded aboard. *Id.*

vessel DELTA BRAZIL which completed delivery of the cargo to the original destinations in South America. Repairs on the DELTA NORTE were completed on March 22, 1978, and modifications were also conducted on the couplings on Delta's other LASH vessels, the DELTA MAR and the DELTA SUD pursuant to DeLaval's recommendation.

While the DELTA NORTE was undergoing repairs, Delta attempted to mitigate its losses and preserve its South American trade route by borrowing vessels from its West African routes[4] and using them in lieu of the DELTA NORTE in the South American trade. To complicate matters, however, during the detention of the DELTA NORTE the Port of New Orleans was subjected to a general strike on October 1, 1977, directed against all vessels and subsequently a selective strike directed against automated ships including LASH vessels which lasted until December 1, 1977. Attempts to avoid the strike led to further mitigation efforts on Delta's behalf.

4. Delta's eight conventional vessels were used exclusively on the West African route: DELTA ARGENTINA, DELTA BRAZIL, DELTA MEXICO, DELTA PARAGUAY, DELTA URUGUAY, DEL ORO, DEL RIO, and DEL SOL.

5. The hard damages ($2,250,000) were described as expenses not charged to the vessel voyage accounts. This includes expenses for surveying, towing, insurance, dockage, transportation, personnel, equipment and supplies.

6. On appeal, Delta does not dispute the stipulation of $2,250,000 for hard damages, the trial court's award of $237,887.04 for expenses on the casualty voyage or the award for second freight for $857,624. The trial court's damage award is:

54. Delta is entitled to recover the following damages proved by a preponderance of the evidence of record in this matter:

| | |
|---|---|
| Stipulated Hard Damages | $2,250,000.00 |
| Detention | $ 251,011.64 |
| Second Freight | $ 857,624.00 |
| DELTA NORTE Expenses | $ 237,887.04 |
| Total | $3,596,522.68 |

Delta disputes the award of $251,011.64 for detention damages.

7. (ii) Delta called Arthur Munster as a witness to introduce its damage claim using books and

Delta brought suit against Avondale, DeLaval and Zurn, and during the liability phase of the trial the parties announced that all of Delta's claims against the defendants had been compromised except for the amount of damages recoverable by Delta from DeLaval and Zurn. On the eve of the damages trial the defendants stipulated that Delta was entitled to recover certain "hard damages"[5]. The damage issues were tried to the court which dismissed Avondale and entered judgment that Delta recover the sum of $3,596,522.68[6] from DeLaval and Zurn. Disagreeing with the District Court on several matters, Delta appeals to this Court.

### Delta LASHes Out

Delta contends that the District Court erred by (i) dismissing Avondale, (ii) excluding the testimony of its witness Arthur Munster[7], (iii) miscalculating lost profit on the casualty voyage, (iv) miscalculating detention damages for the DELTA NORTE, (v) failing to award detention damage for the changeout of the DELTA MAR and DELTA SUD couplings, (vi) failing to

records showing the earnings of its vessels during the detention period. Munster left Delta after the detention period but was subsequently employed by Delta to assist in preparation of its damage claim and to testify at trial. Munster had been deposed several times during pretrial discovery during which there was extensive questioning about and over numerous accounting records, recaps, etc. Delta did not list Munster as an expert witness in its pretrial order or qualify Munster as an expert at trial. Delta submitted a list of witnesses to all parties to be inserted in the pretrial order. Munster appears on that list, designated as "Damages and Facts." Delta attempted to elicit opinion evidence from him as a lay witness under F.R.Evid. 701(a). The District Court excluded any opinion evidence from Munster on lost profits, but the court was still able to calculate figures for average profit per voyage which Delta does not question on appeal. Delta's dispute with the District Court is essentially based on that court's decision on the amount of detention time based upon the testimony of Delta's witness Joseph Landry. We agree with Delta that the District Court miscalculated the amount of detention time and consequently—despite our concern over the trial judge's ruling—we do not find it necessary to reach the question of admissibility of Munster's testimony.

award damages associated with replacement of the DELTA MAR and DELTA SUD couplings, (vii) failing to award to Delta processing expenses associated with its declaration of general average and (viii) failing to award Delta attorneys' fees. We will address these points separately.

### (i) Dismissal of Avondale

■ The first issue Delta raises is whether the trial court erred in dismissing Delta's claims against Avondale. During the liability phase of the trial the parties compromised[8] all issues except for the amount of damages recoverable by Delta from DeLaval and . Zurn. Because there was no stipulation or determination of the liability of Avondale to Delta, the trial court concluded that the claims against Avondale should be dismissed. We agree. Delta failed to adduce any evidence at trial establishing liability on the part of Avondale, nor does the record reflect any stipulation of Avondale's liability. We hold that the trial court correctly concluded that the claim be dismissed.

**8.** The trial court was not privy to the specific terms of the agreement and neither are we.

**9.** Delta agreed to carry the ex-DELTA NORTE cargo to the original South American ports but charged the cargo owners additional freight for carriage on the substituted DELTA BRAZIL. The freight was, however, calculated at a lesser rate. The trial court found that Delta, as bailee of the cargo aboard the DELTA NORTE and later the DELTA BRAZIL, was a proper party entitled to assert the right of cargo to recover second freights paid as a result of the casualty. *See* 1983 A.M.C. at 2832. The trial court concluded that Delta was entitled to recover second freight.

**10.** The trial court's finding of fact on this issue is:

32. Second, any profit or loss attributable directly to the carriage of cargo originally shipped aboard the DELTA NORTE voyage No. 35 *must also be accounted for.* Plaintiff has alleged that it lost profits on the casualty voyage itself. The evidence shows, however, that freights were paid to Delta for cargo laden on the DELTA NORTE voyage No. 35, and those freights were retained by Delta even though the DELTA NORTE did not complete that voyage. The parties have stipulated, and I have found that Delta is entitled to $2,250,-

### (iii) Miscalculated Lost Profit on the Casualty Voyage

After the casualty on October 8, 1977, the DELTA NORTE was towed to Oranjestad, Aruba and the conventional break-bulk vessel, the DELTA BRAZIL, was dispatched in ballast from New Orleans on its voyage 46 to pick up the DELTA NORTE's cargo in Aruba and deliver it to the original ports of destination in South America. The DELTA BRAZIL returned with northbound cargo. Delta contends that it lost profits from the DELTA NORTE on the casualty voyage even though it collected freight for the cargo laden on that vessel and even though it charged second freight[9] for the same cargo to complete its delivery on the DELTA BRAZIL. Specifically, Delta urges that it is entitled to recover lost profit on the *northbound* leg of the voyage that the DELTA NORTE would have made except for the casualty.

■ The District Court determined that there was no evidence that the DELTA NORTE earned less money on the casualty voyage than it ordinarily would have earned on the voyage.[10] Initially we point

000 in "hard damages" caused by the casualty. There is no itemization of extra expenses or damages relating specifically to the casualty voyage included in the stipulation, however, and there is no evidence in this record of any specific expense that would have reduced the expected profit to be made from the freights collected on the DELTA NORTE voyage No. 35. Extraordinary expenses incurred in connection with the casualty have presumably been allowed for in accordance with this stipulation. There is no evidence, therefore, that the DELTA NORTE earned less money on voyage No. 35 as a result of the casualty than it ordinarily would have earned.[18] On the other hand, there is evidence that the DELTA BRAZIL voyage No. 46 earned a profit of $225,248 [19] from freights collected for carriage of the same cargo for which Delta had already been paid in connection with the DELTA NORTE voyage No. 35. Accordingly, it is necessary to deduct the profit earned by the DELTA BRAZIL from Delta's total detention claim in order to avoid a double recovery profit.

[18] The plaintiff has asserted in its post-trial submissions that the DELTA NORTE earned profits of $359,626 on its voyage No. 35 up to the time of the coupling casualty. Court . Record Documents No. 155, at 4; No. 156, at

out that findings of fact by the trial court in admiralty cases are subject to the clearly erroneous rule. *McAllister v. United States,* 348 U.S. 19, 20, 75 S.Ct. 6, 7, 99 L.Ed. 20 (1954); F.R.Civ.P. 52(a). However, when essentially based on an incorrect legal principle, Rule 52(a) clearly erroneous does not apply and we disregard any such possible findings. *Pullman-Standard v. Swint,* 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66, 79 (1982); *Armco, Inc. v. Armco Burglar Alarm Co., Inc.,* 693 F.2d 1155, 1162 (5th Cir.1982); *City of New Orleans v. American Commercial Lines, Inc.,* 662 F.2d 1121, 1123 (5th Cir.1981).

 In this matter, the District Court failed to take into consideration that each voyage was a *round trip* which also included loading cargo in South America for carriage and delivering at New Orleans. Rather than returning with cargo, the DELTA NORTE was brought back under tow without cargo and consequently Delta lost all profit attributable to the cargo it

would have loaded in South America. Loss of profits or loss of the use of a vessel pending repair arising from a collision or a maritime casualty is a proper element of damages provided, however, profits are proved with reasonable certainty. *The CONQUEROR,* 166 U.S. 110, 125, 17 S.Ct. 510, 516, 41 L.Ed. 937, 944 (1897); *The Steamboat POTOMAC v. Cannon,* 105 U.S. 630, 631–32, 26 L.Ed. 1194 (1881); *Bolivar County Gravel Co. v. Thomas Marine Co.,* 585 F.2d 1306, 1308 n. 2, 1979 A.M.C. 1806, 1808 n. 2 (5th Cir.1978); *Skou v. United States,* 478 F.2d 343, 345, 1973 A.M.C. 1482, 1484 (5th Cir.1973), *modified,* 526 F.2d 293 (5th Cir.1976).

To arrive at the correct figure for lost profit on the casualty voyage, we begin with the District Court's finding that the DELTA NORTE was earning an average profit per voyage of $655,180.50.[11] This finding was calculated by the District Court from the profits of three voyages immediately preceding the casualty and three voyages immediately following the

---

9. Delta has cited no supporting evidence for that figure, and I have found none in this record. The figure is contained in Schedule 2 of Exhibit XI of Delta's statement of claim prepared by its witness Munster, See Delta's Offer of Proof, Court Record Document No. 146, but that document is not evidence.
[19] Stipulated testimony of Roger Peck given on May 20, 1982.
1983 A.M.C. at 2825.

11. This finding is not contested on appeal. Finding of Fact 30 is as follows:
30. During the trial, Delta failed to produce any evidence of the actual profits earned by the DELTA NORTE. It is possible, however, to piece together a finding concerning the average profits of the DELTA NORTE by drawing certain inferences from, and combining certain bits of evidence in, the record. The total direct profit net of operating differential subsidy of the DELTA NORTE for its three voyages immediately preceding the casualty, voyages No. 32, 33 and 34, and its three voyages immediately following the casualty, voyages No. 36, 37 and 38, was $3,931,083, or an *average profit per voyage of $655,180.50.*[16] Therefore, the maximum total loss of profit to Delta for the 1.51 lost LASH voyages was $982,770.75. However, in order accurately to reflect actual lost profit, if any, on the South

American trade route as a result of the DELTA NORTE casualty, certain adjustments must be made to reflect the success of Delta's efforts to mitigate its losses.
[16] No witness or document in the record provided me with a precise figure of total profits for these six voyages or average profits per voyage of the DELTA NORTE. I arrived at this figure by beginning with the total revenue and total expenses figures for DELTA NORTE voyages 32–34 and 36–38 contained in Exhibit C to the parties' stipulation. Court Record Document No. 148, and Plaintiff's exhibit 14. With those figures as my starting point, I relied upon the testimony of Delta's present controller, Robert Nolan, given on May 21, 1982, that Delta itself computes its own profit figures by subtracting all expenses from total revenue and adding to that figure sums received as part of the government subsidy program for domestic steamship lines. Using this method, I subtracted the expense figures for the six DELTA NORTE voyages from the revenue figures contained in the stipulation and Plaintiff's exhibit 14, and then divided by six to arrive at an average profits per voyage figure. This process would have been made simpler had Delta provided a witness competent to make such profit calculations.
1983 A.M.C. at 2824 (emphasis added).

casualty.[12] Delta's evidence at trial through the admitted and uncontradicted testimony of Arthur Munster showed a profit of $359,626.02 was made on the southbound cargo carried by DELTA NORTE.[13] The District Court determined in footnote 18 to finding of fact 32, *see supra* note 10, page 999, that Delta asserted in its post-trial submission that the DELTA NORTE earned profits of $359,626 on voyage No. 35 up to the time of the casualty, i.e. the southbound leg. Although the court undertook to find that Delta did not cite any supporting evidence for that figure and there was none in the record the uncontrovertible fact is that Arthur Munster testified positively, with no objection, to a figure of a profit of $359,626.02 made on the southbound leg. *See* trial transcript 175–76. *See* note 13. To arrive at the lost profit figure, the profit from the southbound leg ($359,626.02) is subtracted from the uncontested average profit per voyage ($655,180.50). Therefore, Delta established lost profits on the northbound leg of casualty voyage in the amount of $295,554.48.

DeLaval and Zurn contend on appeal that Delta failed to show *any actual loss of cargo* business for the northbound leg of the casualty voyage of the DELTA NORTE and thus are not entitled to lost profit. Defendants contend that Joseph Landry (Delta's witness) conceded that he had no knowledge of any specific lost cargo business for that voyage.

Loss of profit arising from a maritime casualty may be awarded as long as it is proved with reasonable certainty. *The CONQUEROR*, 166 U.S. at 125, 17 S.Ct. at 516, 41 L.Ed. at 944. This usually involves a showing in commercial cases that the

vessel "has been engaged, or was capable of being engaged in a profitable commerce...." *Id.*, 166 U.S. at 133, 17 S.Ct. at 519, 41 L.Ed. at 947. *See also Skou v. United States*, 526 F.2d 293, 298 (5th Cir. 1976) (*quoting Skou v. United States*, 478 F.2d 343, 344 (5th Cir.1973): "[M]ost clear, however, is the proof that MADS SKOU was in immediate demand, as were her sister ships, upon her return to service. This demonstrates 'that profits may be reasonably supposed to have been lost because the vessel was active in a ready market.'" In this case, Joseph Landry testified that the voyages before the DELTA NORTE casualty voyage were profitable and the voyages thereafter were profitable and cargo was carried in between. To require the vessel owner to prove that specific cargos were not carried because of the casualty would be unsound for several reasons. First, it would impose an onerous burden not called for in this type of case. Second, it would be a rejection of the time honored rule in maritime cases that a proper method of determining lost detention profits is to seek a fair average based on a number of voyages before and after. *See American-Hawaiian Steamship Co. v. The Steamship SAN CLEMENTE*, 1943 A.M.C. 758, 770–73 (N.D.Cal.1943). (*See also supra* note 12).

Delta also charged the DELTA NORTE cargo owners a second freight for the carriage of the same cargo to South America on the DELTA BRAZIL and conceded at trial and on appeal that a credit must be given for the profit earned by the DELTA BRAZIL. The District Court found that there was evidence that the DELTA BRAZIL earned a profit of $225,248 for freights

---

**12.** In this case the trial court used six voyages to arrive at the average profit per voyage for Delta (3 voyages before, 3 voyages after). *See, e.g., Midland Steamship Line, Inc. v. City of Chicago*, 1964 A.M.C. 1393 (N.D.Ill.1963). Other courts adopt the "three voyage rule" *see Moore-McCormack Lines, Inc. v. The ESSO CAMDEN*, 244 F.2d 198, 1957 A.M.C. 1972 (2d Cir.), *cert. denied*, 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 37, 1957 A.M.C. 2492 (1957). In *The ESSO CAMDEN*, the court determined that three voyages

which covered a total of 241 days were sufficient in point of time and activity to evaluate the probable loss of profits from detention. 244 F.2d at 201.

**13.** Delta established at trial through the uncontradicted testimony of Arthur Munster that the revenue for the voyage was $1,792,514.43 and that the net expenses for the voyage were $1,432,888.41 generating a profit of $359,626.02.

collected for carriage of the same cargo.[14] To avoid a double recovery the trial court and we agree that we must deduct this amount from the lost profit of $295,554.48 established on the casualty voyage leaving a lost profit of $70,306.48 for the DELTA NORTE's casualty voyage.

Delta has established with reasonable certainty its lost profit on the casualty voyage. To the extent that there might—the word is might—be any conflict with the trial court's findings, they fail under F.R. Civ.P. 52(a) because they are based on erroneous legal principles. The trial court erroneously concluded that there was no evidence in the record to show what the DELTA NORTE earned on the partially completed casualty voyage. We conclude therefore that Delta is entitled to recover $70,306.48.[15]

### (iv) Lost Profit During Repair of the DELTA NORTE

After the coupling failure on October 8, 1977, the DELTA NORTE was out of service until repairs were completed on March 22, 1978. In the interim, however, two strikes by longshoremen affected the Port of New Orleans. From October 1 to October 12, 1977, a general strike was directed against all vessels in the Port. After the general strike ended the longshoremen continued a selective strike against automated vessels, including LASH vessels, until December 1, 1977.[16] The combination of the strikes and the loss of the use of the DELTA NORTE caused Delta to restructure its trade routes in order to mitigate its losses and maintain sailings on each route.

At the time of the casualty Delta had two basic trade routes from New Orleans, a route to South America using the LASH vessels, DELTA NORTE and DELTA MAR[17] and a route to West Africa using the conventional break-bulk vessels, the DELTA ARGENTINA, DELTA BRAZIL, DELTA MEXICO, DELTA PARAGUAY, DELTA URUGUAY, DEL ORO, DEL RIO and DEL SOL. With both LASH vessels out of service[18] during the selective strike and with the DELTA NORTE undergoing repairs until March 22, 1978, Delta substituted on its South American route six voyages of break-bulk vessels which would otherwise have been sailing to West Africa.[19]

If there had been no strike or transfer of vessels between trade routes, the detention claim would have been a simple calculation based upon the number of days the DELTA NORTE was out of service after the selective strike ended, 112 days,[20] multiplied by the average daily lost profit for the ves-

---

**14.** 1983 A.M.C. at 2825.

**15.** Recapitulation:

Delta is entitled to recover $70,306.48 as lost profit on the casualty voyage:

| | |
|---|---|
| Average profit per voyage of the DELTA NORTE | $655,180.50 |
| Profit on the southbound leg | −359,626.02 |
| Lost profit on the northbound leg | 295,554.48 |
| Credit to Defendants for profit for DELTA BRAZIL's carriage of DELTA NORTE's cargo | 225,248.00 |
| Lost profit recoverable by Delta | $ 70,306.48 |

**16.** Delta does not claim lost profits during the period of time when the DELTA NORTE would have been detained in port because of the longshoremen's strike. The strike would have prevented the DELTA NORTE from loading LASH barges in the Port of New Orleans.

**17.** From April 9, 1976 through March 1978, the DELTA SUD was under time charter to Central Gulf Lines and was not being used by Delta on the South American route.

**18.** The DELTA NORTE and The DELTA MAR.

**19.** The DELTA BRAZIL voyage 46, the DELTA MEXICO voyage 42, the DELTA ARGENTINA voyage 49, the DEL RIO voyage 77, the DELTA PARAGUAY voyage 46, and the DELTA MEXICO voyage 43.

**20.** The strike ended on December 1, 1977 and the DELTA NORTE returned to service on March 22, 1978:

| MONTH | NUMBER OF DAYS |
|---|---|
| December | 31 |
| January | 31 |
| February | 28 |
| March | 22 |
| | 112 |

sel.[21] Delta's efforts to mitigate damages complicated the calculations and led the District Court astray.

### (a) The District Court's Findings

The district court came up with a "Representative Period" of 269 days. The nearest we can come to divining its origin or purpose is the trial judge's findings that this period roughly compared to the three months before and the three months after the casualty which was used to determine average voyage and daily profits. To this may have been added the sixty days of the strike. Even on with this hypothesis we still miss 29 days $(6 \times 30 = 180 + 60 = 240)$.

According to the trial judge's findings this becomes irrelevantly relevant because he accepted this period of time as reflecting a relevant and representative period for analysis of Delta's operations. See 1983 A.M.C. at 2819. Starting from this precarious premise of 269 days rather than 112 days, the court reasoned that if there had been no strike or coupling failure on the DELTA NORTE, 12.51 LASH voyages would have been possible on Delta's South American line.[22] The court then subtracted from this figure two voyages which were lost because of the strike and nine voyages which were carried out leaving a total of 1.51 voyages lost on the South American trade route which the judge then found attributable to the DELTA NORTE casualty. The ultimate award for detention of the DEL NORTE was based on 1.51 voyages—a figure of 65 days in contrast to the unchallengeable loss of 112 days (see supra note 20).

As we stated above, on the uncontradicted evidence, the detention period was 112 days (see supra note 20). Determination of detention damages would have been the simple arithmetical process of multiplying average daily profit by 112. That is all Delta claimed below or here. Unfortunately, in the heat of battle during the trial the trial judge got off into an inexplicably "representative period" 1983 A.M.C. at 2820. This period began on July 5, 1977 ending March 31, 1978, a period of 269 days.

How or why this period has anything to do with this case—other than possibly the beginning and ending dates of the three pre-casualty and three post-casualty voyages—is difficult to discern. This is so because the beginning date, July 5, 1977, is three months before the coupling breakdown October 8, 1977. March 31, the ending date of the "period" was nine days after the DEL NORTE went back into service.

■ Pursuing attention to this "Representative Period" and using the erroneous standard of actual cargo carried which we discuss later the trial judge made additional findings. In mitigation[23], Delta used five conventional vessels from its West Africa route to perform six voyages on the South American route. See supra note 19. These vessels carried 35,049 tons of cargo to South America so that the District Court found that more cargo was actually carried on the South American lines during the representative period than would have been carried had there been no casualty. This, however, reduced the tonnage carried on the West African line. The court, after deducting voyages attributable to efforts to mitigate the strike and after deducting the DELTA BRAZIL voyage on which the ex-DELTA NORTE cargo was carried, found that Delta lost 3.66 voyages from the West African trade. The trial court multi-

---

**21.** Moore-McCormack Lines, Inc. v. The ESSO CAMDEN, 244 F.2d 198, 202, 1957 A.M.C. 972 (2d Cir.), cert. denied, 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 37, 1957 A.M.C. 2492 (1957); Skou v. United States, 526 F.2d 293, 298 (5th Cir.1976).

**22.** 269 days (July 5, 1977—March 31, 1978) divided by an average voyage of 43 days × 2 (for the 2 LASH vessels) equals 12.51 voyages.

**23.** Delta recognized that a vessel owner is required to mitigate damages and may not recover damages for losses resulting from the owner's failure to use reasonable measures to halt the progress of damage. The BALTIMORE v. Rowland, 75 U.S. 377, 387, 19 L.Ed. 463, 466 (1869).

plied the average profit per voyage of $121,271.82 [24] by 3.66 and concluded that Delta lost $443,854.89 [25] from the West African line because of the DELTA NORTE casualty.

To calculate Delta's loss/gain on the South American line the trial court multiplied the 1.51 voyages lost by the average profit per voyage of $655,180.50 and ar-

rived at an initial loss of $982,770.75 and a net loss of $251,011.64.[26]

### (b) Delta's Challenge

Delta challenges these District Court calculations of lost profits on both the South American line and West African line. We conclude that the District Court erred in its *method* of calculating Delta's detention damages.[27] We are persuaded that the

24. The trial court pointed out that the parties stipulated that between July 2, 1977 and March 20, 1978 the direct profit of Delta's voyages on the West African trade route was $2,182,893 which yielded an average profit per voyage of $121,271.82. The average profit figure, the court pointed out, is based upon the stipulation of the parties.

25. The actual amount is $443,854.86 ($.03 difference).

26. Deducting the profits made by the vessels substituted from the West African line, $950,366, and the profit earned by the DELTA BRAZIL from freights collected to carry the ex-DELTA NORTE cargo, $225,248, the court concluded that Delta made a profit on its South American line of $192,843.25 as a result of the DELTA NORTE casualty. Subtracting this amount from the loss on the West African line ($443,854.89) the court awarded Delta lost profits of $251,011.64.

The trial court, however, multiplied 1.50 voyages by $655,180.50. 1.51 would be the correct amount if followed and multiplied by $655,180.50 yields $989,322.55, a difference which is insignificant.

27. Even accepting this erroneous method, trial court also erred in its own calculations. Although the following errors which we point out are not considered or significant in our ultimate disposition on appeal we set forth our analysis of those errors.

The South American calculations begin with 12.51 total voyages possible within the July 5, 1977—March 31, 1978 "representative period." The trial court subtracted two voyages lost by the strike and nine voyages which were "actually accomplished", 1983 A.M.C. at 2820, by LASH vessels. However, the nine voyages included two *sailings,* the DELTA MAR voyage 38 which commenced on March 18, 1978 and the DELTA NORTE voyage 36 which commenced on March 23, 1978. The DELTA MAR and DELTA NORTE did not return within the relevant time period (July 5, 1977—March 31, 1978). Because the trial court considered a voyage to average 43 days in length, the two vessels only made 23 days or .53 voyages before the end of the relevant period. The trial court erroneously concluded that two sailings were two voyages "actually accomplished."

The trial court also erred in subtracting two complete voyages which it considered Delta to have lost due to the strike. 1983 A.M.C. at 2820. The DELTA NORTE sailed on September 30, 1977, the day before the strike began, October 1, 1977, and was expected to return approximately November 12, 1977. She could have begun her next voyage on December 1, 1977 (except for the casualty) and consequently would have lost only 18 days as a result of the strike. The DELTA MAR was at sea when the strike began and returned to New Orleans on October 8, 1977. She lost 34 days so that a total of 54 days or 1.21 voyages were lost by these vessels due to the strike. Subtracting 7.53 voyages and 1.21 voyages from the total of 12.51 possible voyages, Delta lost 3.77 voyages using the District Court's *method* of detention calculation. We reach these figures through the following analysis:

| | |
|---|---|
| Trial court finding – 9 voyages "accomplished" | 9 |
| Our determination that 2 were not "accomplished" | −2 |
| | 7 |
| Vessels for two voyages completed only 23 days (43 day voyage average) | + .53 |
| Voyages actually accomplished | 7.53 |

\* \* \* \*

| | |
|---|---|
| Trial court finding – 2 voyages lost to strike | 2 |
| Our determination that the 2 voyages lost a total of only 54 days (43 day voyage average) | 1.21 |

\* \* \* \*

| | |
|---|---|
| Voyages accomplished | 7.53 |
| Voyages lost to strike | + 1.21 |
| | 8.74 |

\* \* \* \*

| | |
|---|---|
| Possible voyages | 12.51 |
| | −8.74 |
| | 3.77 |

We emphasize again however, that Delta only claimed detention damages for the 112 days the DELTA NORTE was down after the strike or the equivalent of 2.6 voyages. Using the trial court's method of calculation—with the two corrections—Delta would recover more than it sought (3.77 voyages under the trial court's method; 2.6 sought by Delta).

District Court erroneously concluded that the detention damages were to be calculated on the basis of (i) the representative time period of July 5, 1977—March 31, 1978; and (ii) loss or gain of cargo tonnage.

■■ The District Court initially went—or was led—astray when it considered the July 5, 1977—March 31, 1984 (269 days) as the detention period in its calculations. Delta only sought damages for 112 days. Delta does not claim lost profits during the period of time when the DELTA NORTE would have been detained in port because of the longshoremen's strike. Furthermore, we conclude therefore that the district court's findings regarding the method of calculating the detention damages for the DELTA NORTE are erroneous and the proper calculation should have been to determine the lost profit for the 112 days for the DELTA NORTE after subtracting the net profit made by the substituting vessels from the West African line.

■ Moreover, we point out again the District Court was erroneously concerned with cargo tonnage reduction on the South American and West African route.[28] Calculation of detention damages is based upon the number of days detained multiplied by the average profit per day; *The ESSO CAMDEN*, 244 F.2d at 202; *Skou v. United States*, 526 F.2d at 298. Proof of specific cargo tonnage is not necessary to this calculation since this has necessarily been taken into account in determining profit per 6 voyages, profit per day, etc. We hold that the trial court's method of calculating the detention damages was based on erroneous legal principles, so F.R. Civ.P. 52(a) does not apply. We now set forth the correct calculation.

To calculate properly Delta's detention damages the starting point is the unchallengable District Court's findings of an average profit per voyage of $655,180.50 [29]

---

28. We set forth some representative findings by the trial court on the calculation for the South American route. The trial court's analysis misses the point: we are not concerned with the cargo tonnage reduction. We are concerned with calculations of voyages before and after the casualty to determine on a voyage, daily, or both, what the profits were.

15. Landry's testimony clearly shows that, as a result of Delta's decision to substitute conventional vessels from its West African trade route on the South American route vacated by its LASH vessels, Delta carried more cargo to South America than it would have been able to carry during the same period of time had there been no casualty. During that time period, however, as a result of its decision to use the conventional vessels on its South American trade route, Delta lost cargo on its West African line.

\* \* \* \* \* \*

20. During the representative period, July 5, 1977 through March 31, 1978, nine LASH voyages were actually accomplished on Delta's South American trade route. These voyages carried a total of 141,345 tons of cargo, or an average of 15,705 tons per voyage. Had there been no coupling casualty aboard the DELTA NORTE and no longshoremen's strike against the LASH vessels, 12.51 LASH voyages on Delta's South American line would have been possible. Rounding off that figure to 13, the nearest whole number of possible LASH voyages, and assuming that each of the 13 voyages would have carried 15,705 tons of cargo, a total of 204,165 tons could have been carried. The longshoremen's strike would have prevented two of these 13 possible LASH voyages thus reducing cargo that could have been carried had there been no casualty by 31,410 tons to 172,755 tons.

21. The nine LASH voyages that were actually accomplished from July 5, 1977 to March 31, 1978 carried 141,345 tons of cargo.

\* \* \* \* \* \*

The conventional vessels Delta substituted into its South American service from West Africa carried 35,049 tons of cargo. To avoid duplication of cargo figures, the DELTA NORTE voyage No. 35 cargo tonnage, which had been included in the calculation of tonnage carried by the LASH vessels, was not included by Landry in his calculation of cargo carried on the South American route by the substituted conventional vessels. Thus, the total cargo actually carried on the South American route during the representative period chosen by plaintiff's witness was 176,394 tons.

22. Delta therefore actually carried 3,639 more tons of cargo on its South American line from July 5, 1977 to March 31, 1978 than its LASH vessels would have carried on the South American line during the same period had there been no casualty.

29. *See supra* note 11 and accompanying text.

and an average voyage of 43 days.[30] To determine Delta's lost profit, we divide $655,180.50 by 43 resulting in lost profit of $15,236.76 per day or $1,706,517.12 for the 112 days of detention. These formulae are well established in the determination of detention damages. *See Moore-McCormack Lines, Inc. v. The ESSO CAMDEN,* 244 F.2d 198, 202 (2d Cir.), *cert. denied,* 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 37 (1957); *Skou v. United States,* 526 F.2d 293, 298 (5th Cir.1976). The calculation does not end there. We are still required to deduct the net profit made by the substituting vessels from the West African route.

In response to the casualty, Delta used its West African line vessels, the DEL RIO voyage 77, the DELTA PARAGUAY voyage 46, and the DELTA MEXICO voyage 43 to cover the South American route.[31] The District Court found these vessels earned a profit of $950,366 on these voyages to South America but their removal from the West African line also caused Delta to suffer a loss.[32] The vessels were operating on 92 day average voyages[33] to West Africa and the District Court found they averaged $121,271.82 profit per voyage.[34] To establish the correct profit per voyage on the West African route we exclude The DELTA PARAGUAY voyage 44.[35] This will result in a total of $2,465,-

---

**30.** The parties stipulated that the average voyage length was 42 days. The trial court used 43 days. We accept the 43 day average.

**31.** The DELTA MEXICO entered South American service on voyage 42 on November 2, 1977 and the DELTA ARGENTINA entered the South American service on voyage 49 on November 11, 1977. Both of the voyages began during the longshoremen's selective strike against LASH vessels. The District Court found that Delta's decision to place these vessels in the South American service is attributable to the strike and not to the DELTA NORTE casualty. 1983 A.M.C. at 2820. We agree.

**32.** 1983 A.M.C. at 2825–26.

**33.** Landry's uncontradicted testimony indicates that the vessels were on the 92 day average voyage.

**34.** The parties stipulated that between July 7, 1977 and March 20, 1978 the total direct profit net of operating differential subsidy of Delta's voyages on the West African trade route was $2,182,893.00. 1983 A.M.C. at 2823. The trial court arrived at the average daily profit by dividing $2,182,893 by 18 (which equals the number of voyages during roughly the same period as July 5, 1977—March 31, 1978). *But see* note 35 in which we exclude a certain voyage and these numbers change.

**35.** Delta contends that the trial court erroneously included in the computation of average profit per voyage ($121,271.82) on the West African route during the representative time period (July 5, 1977—March 31, 1978), voyage number 44 of the DELTA PARAGUAY. Delta urges that this voyage must be excluded from the averaging process since it was not a representative voyage. Specifically, the plaintiff and defendants stipulated that Delta's books and records revealed that certain summaries of data were accurate.

### STIPULATION

Delta Steamship Lines, Inc., ("Delta"), DeLaval Turbine, Inc., ("DeLaval") and Zurn Industries, Inc., ("Zurn"), through undersigned counsel, stipulate as follows:

1. The books and records of Delta reveal that the following summaries of data are accurate:

A)

| VESSEL | VOYAGE | DATE COMMENCED | PROFIT NET OF ODS |
|---|---|---|---|
| SOL | 80 | 12/06/77 | $ 389,062 |
| ARGENTINA | 50 | 12/28/77 | 340,593 |
| BRAZIL | 47 | 12/31/77 | 46,303 |
| URUGUAY | 45 | 01/24/78 | 10,069 |
| RIO | 78 | 02/21/78 | 123,130 |
| PARAGUAY | 47 | 03/03/78 | 147,106 |
| ARGENTINA | 51 | 03/09/78 | 208,182 |
| BRAZIL | 48 | 03/20/78 | (179,929) |
| PARAGUAY | 44 | 07/14/77 | (283,050) |
| PARAGUAY | 45 | 09/28/77 | (107,411) |
| MEXICO | 41 | 08/08/77 | 141,960 |
| ARGENTINA | 48 | 08/31/77 | 277,051 |
| RIO | 76 | 09/23/77 | 217,560 |
| SOL | 78 | 07/02/77 | 272,179 |

935 ($2,182,893 + $283,042) [36] divided by 17 (number of voyages—formerly 18 but voyage 44 excluded) yielding an average profit per voyage of $145,055. The resulting average profit per voyage day is $1,576.68 ($145,055 divided by 92 voyage days). The vessels spent 202 days [37] on the South American route to mitigate the loss of the DELTA NORTE and consequently cost Delta profits of $318,489.36 [38] from its West Africa trade. Thus, substituting vessels from West Africa to the South American line earned Delta a net profit of $631,876.64 [39] which must be offset against the loss suffered by the DELTA NORTE for a net detention loss of $1,074,640.48.

 Although not expressly addressed by the district court DeLaval and Zurn raise a mitigation issue. DeLaval and Zurn are concerned by Delta's use of its West African vessels on the South American route. The use of substitute vessels to replace a damaged vessel is a form of mitigation of damages by a shipowner. *See Brooklyn Eastern District Terminal v. United States*, 287 U.S. 170, 53 S.Ct. 103, 77 L.Ed. 240, 1932 A.M.C. 1487 (1932); *Bolivar County Gravel Co. v. The Thomas Marine Co.*, 585 F.2d 1306, 1308–09, 1979 A.M.C. 1806, 1808–10 (5th Cir.1978); *Continental Oil Co. v. S/S ELECTRA*, 431 F.2d 391, 393, 1970 A.M.C. 2135, 2138 (5th Cir. 1970), *cert. denied* 401 U.S. 937, 91 S.Ct. 925, 28 L.Ed.2d 216, 1971 A.M.C. 816 (1971). Defendants assert that detention damages cannot be awarded to Delta when Delta has avoided any actual lost profits through the use of substituted vessels from its fleet. *Brooklyn*, 287 U.S. 170, 53

| VESSEL | VOYAGE | DATE COMMENCED | PROFIT NET OF ODS |
|--------|--------|----------------|--------------------|
| SOL | 79 | 09/13/77 | 194,669 |
| URUGUAY | 44 | 09/17/77 | 136,948 |
| URUGUAY | 43 | 07/05/77 | 109,480 |
| ORO | 71 | 10/19/77 | 138,991 |
| TOTAL | | | $2,182,893 |

\* \* \* \*

This stipulation did include voyage number 44 of the DELTA PARAGUAY. The stipulation, however, also contains the following information concerning PARAGUAY 44:

The voyage shown as PARAGUAY 44 was carried as such for Marad accounting purposes. The vessel sustained an engine room casualty after the commencement of loading of cargo at New Orleans. The cargo was discharged and carried on another vessel. No second freight was charged. No revenue was earned on PARAGUAY voyage 44.

When voyages do not fairly represent normal average earnings they are not to be considered in calculating average lost profits. *The ESSO CAMDEN*, 244 F.2d at 201 n. 3. In *The GYLFE v. The TRUJILLO*, 209 F.2d 386 (2d Cir.1954) it was urged that the special commissioner adopted too high a rate of daily profit. The Court stated that to determine what the vessel probably would have earned during the detention period, proof of the "mean of her specific earnings shortly before and after" is frequently offered. *Id.* at 389. The Court pointed out that this has evolved into the "three voyage rule," however, it is not a rule of thumb. The GYLFE's pre-collision voyage was under a charter with a specified freight rate of $25 per ton. The other two charters had fixed rates of $17 and $7.55 per ton respectively. The Court determined that in such a rapidly declining market, the pre-collision voyage should not be included in the determination of lost profits.

We think that *The GYLFE* analysis applies with equal force in this case. The DELTA PARAGUAY voyage 44 according to the stipulation of the parties, was merely carried on Delta's records for Marad accounting purposes and there was no revenue earned. This voyage should be excluded from the average profit analysis on the West African line.

**36.** *See* stipulation note 35.

**37.** The DEL RIO voyage 77 lasted from December 22, 1977 to February 20, 1978 (61 days); the DELTA PARAGUAY voyage 46 lasted from January 10, 1978 to March 1, 1978 (51 days); and the DELTA MEXICO voyage 43 lasted from February 4, 1978 to May 14, 1978 (100 days), but Delta's witnesses and counsel only described voyage number 43 as lasting 90 days so we will use that length (for a total of 202).

**38.** $1,576.68 × 202 (days).

**39.** $318,489.89 subtracted from $950,366 (profit earned by break-bulk vessels on the South American route).

S.Ct. 103; *see also The FAVORITA v. The Union Ferry Co.*, 85 U.S. 598, 21 L.Ed. 856 (1873); *The CAYUGA v. Hoboken, Land & Improvement Co.*, 81 U.S. 270, 20 L.Ed. 828 (1871); *Crain Brothers, Inc. v. Duquesne Slag Products Co.*, 273 F.2d 948, 1960 A.M.C. 2415 (3d Cir.1959); *Sinclair Refining Co. v. The AMERICAN SUN*, 188 F.2d 64 (2d Cir.1951); *The PRISCILLA*, 55 F.2d 32, 1932 A.M.C. 334 (1st Cir.1932); *Standard Oil Co. v. The S.S. GLENDOLA*, 47 F.2d 206, 1931 A.M.C. 302 (2d Cir.), *cert. denied*, 283 U.S. 857, 51 S.Ct. 650, 75 L.Ed. 1463 (1931); *The State of California*, 54 Fed. 404 (9th Cir.1893). We conclude, however, that the fleet rule should not be applied in this case. The rule is intended for situations in which a vessel is removed from service through collision and is merely replaced by an idle substitute vessel from the plaintiff's fleet with no resulting loss of profit. *See Crain Bros., Inc. v. Duquesne Slag Products Co.*, 273 F.2d 948, 1960 A.M.C. 2415 (3d Cir.1959). In this case, Delta operated a liner service and advertised every vessel specifically. There was testimony that there was cargo available for all of the vessels on the West African route and there was no evidence that cargo would not be forthcoming for the West African vessels when advertised. Thus by removing its vessels from the West African route, Delta lost the profits it would have earned.

We hold that the trial court erred in its method of calculating detention damages for the DELTA NORTE. The correct calculation yields $1,074,640.48 in detention damages which Delta is entitled to recover.[40]

**40.** Recapitulation:

Delta is entitled to recover the following for damages for the detention of the DELTA NORTE:

| | | | |
|---|---|---|---|
| Average profit per voyage (DELTA NORTE) | | $ 655,180.50 | |
| Average profit per day | | 15,236.76 | |
| Total lost profit (x112) | | | 1,706,517.12 |
| * * * | | | |
| Lost profit—West African Route: | | | |
| Total profits (17 voyages) | | 2,465,935.00 | |
| Average profit per 92 day voyage | | 145,055.00 | |
| Average profit per day | | 1,576.68 | |
| Total profit (x202) | | 318,489.36 | |
| * * * | | | |
| Profit from using West African vessels on South American route: | | | |
| Profit earned by West African vessels on South American Route | | 950,366.00 | |
| Less: Profit lost on West African route | | | |
| Average profit per voyage | 145,055.00 | | |
| Average profit per day | 1,576.68 | | |
| Total profit (x202) | | 318,489.36 | |
| | | | 631,876.64 |
| Delta's net detention damage recovery | | | 1,074,640.48 |

*(v & vi) Changeout of the DELTA SUD and DELTA MAR Couplings*

After the casualty suffered by the DELTA NORTE, Delta replaced the identical couplings in its other LASH vessels, the DELTA SUD and the DELTA MAR. The District Court found that Delta failed to prove any losses directly related to the coupling changeouts. This was clearly wrong in view of DeLaval's and Zurn's stipulation on liability. 1983 A.M.C. at 2815.

*(a) The DELTA SUD*

Delta contends that the trial court erred when it concluded that Delta failed to sustain its burden of proving claims for the cost of the replacement of the coupling on the DELTA SUD and for loss of profits resulting from the DELTA SUD coupling changeout. The DELTA SUD was time chartered to Central Gulf Lines from April 9, 1976 through March 1978. To support its claims, Delta provided testimony of its port engineer James Ballard who observed the changeouts and Arthur Munster, Delta's chief financial officer. Ballard testified that Delta was advised by its underwriters not to sail around Cape Hatteras with the DELTA SUD until a new coupling was installed, and the vessel called at Norfolk, Virginia where the repairs were conducted. Munster testified that $13,500 was paid for the coupling from DeLaval and that the vessel's time charterer, Central Gulf Lines deducted charter hire for one day and one hour.[41] The charter party specified a rate of $17,500 per day at the time of the coupling changeout and thus $18,229.25 plus $86.80 in crew overtime was attributed to the coupling changeout by Delta.

Because the DELTA SUD was under time charter during detention, the contract rate for the vessel is a guide for measuring lost income of the vessel owner. *The UMBRIA*, 166 U.S. 404, 421, 17 S.Ct. 610, 617, 41 L.Ed. 1053, 1062 (1897); *The Steamboat POTOMAC v. Cannon*, 105 U.S. 630, 26 L.Ed. 1194 (1881); *Skou v. U.S.*, 478 F.2d 343, 347, 1973 A.M.C. 1482, 1487 (5th Cir.1973) *modified,* 526 F.2d 293, 295 (5th Cir.1976). The burden of proving the extent of damages actually sustained is on the vessel owner. *The Steamboat POTOMAC,* 105 U.S. at 632, 26 L.Ed. at 1194. We must subtract from the gross charter hire expenses the vessel owner would have incurred earning that charter hire which were not expended because the vessel was down. *The Steamboat POTOMAC,* 105 U.S. at 632, 26 L.Ed. at 1194; *Skou* 478 F.2d at 347, 1973 A.M.C. at 1487. A daily profit rate is thus established.

At trial Delta established through the uncontradicted testimony of witness Munster that the daily charter rate of the DELTA SUD at the time of the change out was $17,500 per day. Munster also testified that the time charterer deducted the equivalent of one day and one hour of $18,259.24 and $86.80 in crew overtime. However, the record is bare regarding expenses that must be deducted from charter hire. These expenses are an element in the formula that we use if Delta is to recover lost profit for the DELTA MAR. Because evidence of expenses saved was excluded by the trial court, we remand the case to the District Court to determine the expenses saved that would have been expended to perform the charter.[42] Munster testified that the cost of the replacement coupling was $13,500. Delta therefore is entitled to recover the cost of replacement for the DELTA SUD coupling. The loss of charter hire ($18,259.24 plus $86.80) less any savings is to be determined on remand.

*(b) The DELTA MAR*

Delta contends that the trial court erred in failing to award damages for lost

---

**41.** The District Court did not allow Delta's witness Ballard to testify to the amount of time it took to change the coupling after objections from Zurn's and DeLaval's attorneys. DeLaval's attorneys stated: "... Delta was not paid for one day what was charged for one day and one hour off of charter because of this coupling change. This is all they lost." That is all Delta asks for and that is all Delta gets.

**42.** Delta contends that the only expense that could be involved is fuel.

profit and the cost of replacement of the defective coupling on the DELTA MAR. The district court found that Delta failed to sustain its burden of proving these claims. We disagree and hold that the trial court's findings regarding lost profit and cost of replacement for the DELTA MAR are clearly wrong.

James Ballard also supervised the coupling changeout on the DELTA MAR. He testified that the DELTA MAR was ready to sail on December 2, 1977 after the longshoreman's strike was over, but the vessel's underwriters would not permit the vessel to sail until the changeout occurred. Ballard testified that the coupling replacement which was sent by DeLaval arrived in New Orleans on December 1. On December 5, the DeLaval representative arrived and the coupling changeout could then begin. The changeout was completed on December 12, but Delta only made a detention claim for eight days and three hours which we accept. Munster testified that Delta incurred expenses of $28,009 [43] during this period directly related to the coupling replacement. He also testified without objection that the DELTA MAR was averaging $18,495 per day in profits.[44] Delta's evidence of lost profit for the DELTA MAR was again based upon the three voyage before and three voyage after computation. See supra note 12 and accompanying text. At this rate, Delta lost $150,271.88 [45] in profits as a result of the DELTA MAR changeout.

DeLaval and Zurn contend on appeal that the three voyages before and three voyages after calculation utilized by Munster is flawed because some of the voyages do not fall within the July 5, 1977—March 31, 1978 time period established by the court. Defendants' argument is without any basis. That period is not the time we must consider. We are concerned with the actual time the ship was out of service due to coupling change.

We conclude that the testimony relating to the DELTA MAR clearly established losses attributable to the changeout of its coupling. We hold, therefore, that the District Court erred in not awarding Delta $150,271.88 in profits as a result of the DELTA MAR coupling changeout. The proof on the expenses of $28,009 is sparse. We deny it subject to proof on remand.

### (vii) General Average Processing Expenses

At trial Delta asserted a claim for processing expenses associated with its declaration of general average in connection with the DELTA NORTE casualty. The trial court found that no evidence of the specified amount of expenses incurred in connection with that declaration was introduced or admitted and accordingly Delta failed to prove general average processing expenses. We agree and affirm the trial court's ruling. General average disbursements are generally recoverable from the party liable. The ESSO CAMDEN, 244 F.2d at 202, 1957 A.M.C. at 975. In The ESSO CAMDEN the court allowed a commission on general average disbursements by the vessel and a settling agent's commission for services in apportioning the loss between hull and cargo. Expenses associated with general average were also allowed in New York & Porto Rico Steamship Co. v. Director General of Railroads, 1928 A.M.C. 1495, 1497 (S.D.N.Y.1928). In this case the only evidence presented by Delta at the trial was the following statement by Arthur Munster: "[a]nd also to these expenses the additional out-of-pocket expenses of $124,466.00 for the processing of the general average in connection with the DELTA NORTE casualty." Delta also indicated to the trial court that it would be calling an additional witness to testify to the amount which Delta was charged for the preparation of the general average

---

**43.** The expenses included wages, subsistence, stores, supplies, equipment, other maintenance, fuel oil, and other vessel expenses.

**44.** Also admitted into evidence was a chart prepared by witness Munster. The chart covered six voyages of the DELTA MAR, voyages 32, 33,

34, 36, 37 and 38. The chart provided the information necessary to calculate the detention claim for the DELTA MAR.

**45.** $18,495 × 8 days and 3 hours.

statement if the parties could not reach a stipulation on that matter. However, Delta failed ever to call the witness and a stipulation was not entered into by the parties. We agree with the trial court that the evidence presented by Delta is insufficient to support an award for general average processing expenses.

### (viii) Attorneys' Fees

Delta also asserts that it is entitled to recover attorneys' fees in prosecuting this action.[46] Delta's basis for this claim lies in the peculiar exception created in admiralty for breach of the warranty of workmanlike performance (WWLP). *Todd Shipyards Corp. v. Turbine Service, Inc.,* 674 F.2d 401, 1982 A.M.C. 1976 (5th Cir.), *cert. denied,* 459 U.S. 1036, 103 S.Ct. 447, 448, 74 L.Ed.2d 602, 603, 1983 A.M.C. 2111 (1982). The general rule in admiralty is that attorneys' fees are not recoverable by the prevailing party. *Noritake Co., Inc. v. M/V HELLENIC CHAMPION,* 627 F.2d 724, 730 (5th Cir.1980). Delta, however, contends that its claims for attorneys' fees lies in the peculiar exception to this rule: foreseeable damages are recoverable for breach of the WWLP and include reasonable attorneys' fees. *Todd Shipyards,* 674 F.2d at 415, 1982 A.M.C. at 1994–95.

The trial court determined that Delta was not entitled to recover attorneys' fees because the issue of liability was compromised and the record did not contain a stipulation of breach of the WWLP. Absent such a specific finding or stipulation the WWLP exception should not be applied. We are persuaded that the trial court correctly ruled that attorneys' fees are not recoverable in this case. We also emphasize in support of this decision that there was no evidence on attorneys' fees presented during the damages trial nor was there mention of a claim for attorneys' fees in the pretrial order.[47]

AFFIRMED IN PART and REVERSED IN PART AND REMANDED.

---

**46.** Delta asserted a claim for attorneys' fees in the amount of $1,000,000 in its various complaints and in its post-trial submissions.

**47.** RECAPITULATION

DELTA NORTE casualty
 Lost profit recoverable for the
 DELTA NORTE casualty voyage $70,306.48
 Detention damages for the DELTA NORTE 1,074,640.48

DELTA SUD
 Replacement coupling plus 13,500.00
 Charter hire and crew overtime 18,259.24*
 86.80

DELTA MAR
 Lost Profit 150,271.88
 Expenses 28,009.00*

 * Subject to remand.

Subject to errors or omissions check on remand, Delta is entitled to recover the following damages: