**BOLIVAR COUNTY GRAVEL COMPANY, INC., Plaintiff-Appellant,**

v.

**THOMAS MARINE COMPANY, in personam, and M/V J. F. LAMB, her engines, tackle, apparel, etc., in rem, Defendants-Appellees.**

No. 78–1998

Summary Calendar.*

United States Court of Appeals,
Fifth Circuit.

Dec. 11, 1978.

Martin A. Kilpatrick, Randolph Noble, Jr., Greenville, Miss., for plaintiff-appellant.

Lake, Tindall, Hunger & Thackston, W. Wayne Drinkwater, Jr., Greenville, Miss., for defendants-appellees.

Before BROWN, Chief Judge, HILL and VANCE, Circuit Judges.

---

* Rule 18, 5 Cir.; *see Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York et al.*, 5 Cir., 1970, 431 F.2d 409, Part I.

JOHN R. BROWN, Chief Judge:

The plaintiff, Bolivar County Gravel Company, operates a dredge on the Mississippi River. On June 3, 1976, a barge broke away from the tow of the M/V J. F. Lamb and collided with the plaintiff's dredge. As a result of the collision, the dredge lost its anchor and anchor cable. The dredge was inoperable during the ten days it took to make repairs.

The plaintiff sued the M/V J. F. Lamb in rem and its owner, the Thomas Marine Company, in personam. It sought recovery for the cost of repair and replacement and damages for loss of use. On defendants' motion for partial summary judgment, the District Court held that the plaintiff could recover for property damage only. The parties then stipulated that the amount of the property damage was $800, and the District Court entered final judgment for the plaintiff in that amount. The plaintiff appeals the District Court's exclusion of detention damages for loss of use as an element of recovery. We affirm.

■ During the time the dredge was idle, the plaintiff supplied its customers with gravel from an existing stockpile. After the dredge was repaired, the plaintiff replenished its stockpile to pre-collision levels in one month of normal operations. There is no evidence that the plaintiff lost any sales, revenues, or potential customers, nor is there any evidence that it incurred any increased operating expenses.[1] The plain-

---

1. These facts are essentially undisputed, as each party relies principally on the deposition of the plaintiff's manager, Howard Gilbert, to establish the facts involved. Mr. Gilbert testified:

Q (by defendant's counsel) During that ten-day period that your dredge was down and wasn't dredging, did you have any trucks come into the yard?
A (by Mr. Gilbert) Yes, sir.
Q How many? Do you know?
A I sure don't.
Q Was it a normal group of trucks, or was it a heavy group of trucks or a light group of trucks or what?
A Just normal, you know, basic day's I guess you'd say.
Q Did your stockpile get low during that period of time?
A Yes, sir.
Q But you didn't turn away any of them because you didn't have any gravel?
A No, sir.
Q When you got your dredge back operating you built your stockpile back up?
A Yes, sir.
Q You continued to service the trucks that came in there, the county and the individuals?
A Yes, sir.
Q You didn't call anybody at Bolivar County and say: Don't send us any trucks because I don't have any gravel?
A No, sir.
Q You agree that you didn't do it?
A I didn't do it.
Q Did anybody with Bolivar County Gravel, to your knowledge, call anybody that might want to buy gravel and say don't come get any gravel now because our dredge is down?
A No, sir.
Q That didn't occur as far as you know?
A Right.

Q Would you know that had it occurred since you're the manager?
A Yes, sir.

*    *    *    *    *    *

Q When you got your dredge back operable, when you got your anchor and cable, did you continue to work the normal nine-hour days? Did you resume nine-hour days?
A Yes, sir.
Q You did?
A Yes, sir.
Q You didn't work overtime or work any differently than you previously had done?
A No, sir.
Q Do you remember how long it was before you were able to build up your stockpile back up to where you like to have it?
A It took us, oh, I'd say a month or so.
Q But it was at normal production levels?
A Well, not really, you know.
Q What do you mean by that? Y'all had to work harder? Is that what you're saying?
A No. We didn't—yeah, I would say within a month or so we had it back up sort of like we love to keep it, you know.
Q You didn't hire any extra barges or anything of that nature after your dredge got operable again?
A No, sir.
Q Your dredge, after it came back operable, after you got your anchor and cable, your dredge then resumed operating at the same output or production as it did before the dredge was hit?
A Yes, sir.
Q The only item of expense, that is, money paid out, that Bolivar County Gravel incurred or paid out because of this collision, that is, the damage to the dredge, was to buy a new anchor cable and anchor?
A And—
Q And what?

tiff nevertheless argues that it is entitled to recover damages for loss of use.[2] Its argument is grounded on our decision in *Continental Oil Co. v. S.S. Electra*, 5 Cir., 1970, 431 F.2d 391, 1970 A.M.C. 2135, *cert. denied*, 1971, 401 U.S. 937, 91 S.Ct. 925, 28 L.Ed.2d 216.

In *Continental*, the S.S. Electra collided with an offshore drilling platform owned by four oil companies. Though reconstruction of the platform was delayed and the unreconstructed platform was later destroyed by a hurricane, the parties stipulated that had reconstruction begun immediately, 130 days would have been required to get the wells back into operation. The S.S. Electra agreed to pay 90% of the provable damages resulting from the collision, and the parties stipulated that the net income the oil companies would have received on oil produced during the 130 days would have been $60,000. The District Court approved a commissioner's determination that the damages for loss of production consisted of interest for 130 days on the $60,000 net production figure. We reversed, holding that the oil companies were entitled to an award of 90% of $60,000, the full value of the net production lost. We reasoned:

> The oil companies do not claim for lost oil or damage to oil as an asset. Their suit is for damages suffered as a consequence of the collision of the ship with the platform. Profit on oil production is simply one means of measuring the damage suffered. The plaintiffs have lost the use of their capital investment in lease, platform and producing wells for 130 days during which that investment was tied up without return. The fact that the same amount of profit can be made at a later time with the same investment of capital

by removing from the ground a like quantity of oil at the same site does not alter the fact that the plaintiffs are out of pocket a return on 130 days use of their investment. Presumably the oil companies ultimately will produce from the reservoir all the oil that is economic to produce, but, as the District Court pointed out, it will require 130 days longer to do so. The plaintiffs must stay on the site 130 days longer, with investment in place, than necessary but for the ship's negligence.

> This is no theoretical, shadowy concept of loss. It is squarely within the basic damage doctrine for marine collision of *restitutio in integrum*, as applied in many comparable situations.

431 F.2d at 392, 1970 A.M.C. at 2137.

The plaintiff likens itself to the oil companies in *Continental* and asserts that it is entitled to recover the net income it would have earned on the gravel it would have produced during the 10 days the dredge was inoperable. The short answer to this argument is that, unlike the oil companies in *Continental*, the plaintiff is not out of pocket anything by virtue of the lost production time. In *Continental*, the oil companies were worse off after the accident than they had been before—they were 130 days behind in their production than what they would have otherwise been. Although they could eventually extract all the oil beneath the platform that it was profitable to extract, they would have to "stay on the site 130 days longer, with investment in place" in order to do so. The idling of their production for 130 days thus resulted in a tangible and concrete loss—the use for 130 days of the amount of the investment that was tied up in the platform.[3] That is not

---

> A And also the gravel that we lost in those ten days.
> Q Which you built back up within a month.
> A Within a month or so, yes, sir.

**2.** Damages for lost profits arising from the loss of use of a vessel for repairs after a collision or other maritime tort has traditionally been called detention. Detention is allowed "when profits have actually been, or may reasonably [been shown] to have been, lost, and the

amount of such profits is proved with reasonable certainty." *The Conqueror*, 1897, 166 U.S. 110, 125, 17 S.Ct. 510, 516, 41 L.Ed. 937. The burden of establishing that profits were lost is upon the shipowner. *Skou v. United States*, 5 Cir., 1973, 478 F.2d 343, 345.

**3.** In *Continental*, we did not hold that the loss was directly translatable into lost profits on 130 days worth of production. Rather, we stated that:

the case here, however. Apparently because the plaintiff was able to produce more than it could sell, it was able to make up for lost production time. It is today in the same position it would have been had the accident not occurred—its stockpile is at the same level, it has made the same sales, and it has the same amount of gravel left in the ground. Furthermore, it has not shown that the effort required to replenish the stockpile resulted in any expenses over what it would have otherwise incurred.

We think this case closer to *Brooklyn Eastern Terminal v. United States*, 1932, 287 U.S. 170, 53 S.Ct. 103, 77 L.Ed. 240, 1932 A.M.C. 1487, than it is to *Continental.* In *Brooklyn Eastern*, one of the plaintiff's three tugs had been disabled in a collision with the defendant's dredge. During the time the damaged tug was laid up for repairs, the plaintiff used its other two tugs to perform the work previously done by three. There was no proof that this arrangement resulted in any extra expense to the plaintiff. The Supreme Court held that the full-time hire of the disabled tug could not be charged to the defendant as damage flowing from the collision, the rationale being that since the plaintiff had been able to conduct its business so as to avoid any loss, the defendant could not be held liable for damages the plaintiff had never suffered. That rationale applies in full force here. All that the plaintiff suffered as a result of the loss of 10 days production time was a temporary reduction in the size of its surplus stockpile, a reduction that resulted in no economic injury.

AFFIRMED.

We need not consider whether lost profit or a fair return on investment is a better measure. . . . The only evidence before us is of lost profit. The shipowner has not asserted that the profit is excessive but has stood on the erroneous theory that profits are not recoverable at all, only interest on profits.

431 F.2d at 393 n. 3, 1970 A.M.C. at 2139 n. 3.

