**LLECO HOLDINGS, INC., et al.**

v.

**OTTO CANDIES, INC., et al.**

**Civ. A. No. 93–1840.**

United States District Court,
E.D. Louisiana.

Nov. 4, 1994.

Donald Richard Abaunza, Russell Keith Jarrett, Liskow & Lewis, New Orleans, LA, for plaintiffs Nerco Oil & Gas Inc., Agip Petroleum Co. Inc., LLECO Holdings Inc.

George Alexander Weller, Deutsch, Kerrigan & Stiles, New Orleans, LA, for defendant Otto Candies Inc.

## MEMORANDUM OPINION

LIVAUDAIS, District Judge.

This matter was tried on August 22, 1994, before the Court without a jury. Having heard testimony on the issues before the Court and having considered the evidence, the pre-trial and post-trial memoranda submitted by the parties, the record and the applicable law, the Court will enter judgment in favor of plaintiffs LLECO Holdings, Inc., and Agip Petroleum Co. and against Defendant Otto Candies, Inc.

## BACKGROUND

LLECO Holdings, Inc., and Agip Petroleum Co. (hereinafter, collectively, "plaintiffs") are co-lessees of federal mineral lease OCS–G 6663, covering Vermilion Block 109 on the Outer Continental Shelf. LLECO is the operator of the property, and the Vermilion 109 platform is located on the property. On November 7, 1992, there were three working, natural gas wells on the platform.[1] On that date an allision occurred between the M/V Hatty Candies, owned by defendant Otto Candies, Inc. (hereinafter "Candies") and the Vermillion 109 Platform.

The allision caused damage to the platform both above and below the water line, necessitating the wells to be shut-in so the platform could be repaired. Well A–2 was shut-in for a total of 31 days, Well A–4 for a total of 50 days and A–5 for a total of 42 days during the months of November and December 1992 and January and April 1993.

Nerco Oil & Gas, Inc., whose assets were later purchased by LLECO, and Agip filed suit on June 4, 1993, alleging admiralty jurisdiction and alleging that they were co-owners of the Vermilion Platform 109. Nerco and Agip alleged that the M/V Hatty Candies, her owners and operators were the sole cause of the allision, causing Nerco and AGIP damages. These alleged damages included costs of repair, loss of use, deferred production, lost production and other economic losses totalling approximately $1.7 million.

Candies answered, admitting admiralty jurisdiction, admitting that an allision occurred and admitting that certain damages occurred as a result of the allision. However, Candies denied all other allegations.

LLECO then moved to be substituted as the party-in-interest for Nerco after acquiring Nerco's stock. The motion was granted as unopposed.

Prior to trial plaintiffs and Candies stipulated that in exchange for payment by Candies of $910,000 to plaintiffs, plaintiffs settled their claims for the following items of damage: "Physical damage to the Vermilion 109 platform, increased plugging, abandoning and refurbishment costs associated with Vermilion 109, increased operating costs for Vermilion 109, plaintiffs' increased internal overhead, and any claim for prejudgment interest associated with these elements of plaintiffs' claim."[2] In the stipulation, the plaintiffs reserved their right to pursue "the remaining element of their claim, including specifically their claim for loss caused by the downtime resulting to Vermilion 109" as a result of the allision. The plaintiffs further stipulated that any award they might receive on this remaining claim for damages "must reflect a reduction for operating expenses since they have settled their claim in that respect." Additionally, the parties stipulated that, if any award was based on plaintiffs' net in-

---

1. Two other wells had been drilled, but one was a "dry hole" and one only produced for a short time.

2. The stipulation was admitted into evidence at trial as Defendant's Exhibit 15.

come model, the award must reflect a reduction of $97,920 from gross revenues.[3]

The issues at trial were three-fold:

1) whether plaintiffs are entitled to receive the entire net income that was lost while the three wells were shut down, or whether plaintiffs are limited to recovery of the present value of the net income that was lost;

2) whether plaintiffs' recovery had to be reduced by any royalty interest allegedly owed to the Minerals Management Service (hereinafter "MMS"); and,

3) whether plaintiffs are entitled to prejudgment interest on any award for lost income while the wells were shut-in.

Because the parties' testimony was tailored to respective legal theories of recovery as set forth in Fifth Circuit cases, the Court believes it worthwhile to review first the law relative to recovery of lost income from wells shut-in following allisions. This is followed by a summary of the trial testimony and then an analysis of the law as applied to the evidence in this case. In the analysis, the Court will also address the royalty and prejudgment interest issues.

### APPLICABLE LAW

The Fifth Circuit first addressed the issue of damages for lost profits from a well following an allision between a vessel and a platform in *Continental Oil Co. v. SS Electra*, 431 F.2d 391 (5th Cir.1970). On April 8, 1964, the SS Electra struck a platform on which there were two wells in production. *Id.* "There was no damage to the wells and no loss of oil, but the platform was so badly wrecked that production was halted." *Id.*

The defendants agreed to pay "90% of the provable damages." *Id.* The agreement was consummated as to the physical damages to the platform, but the parties could not agree on damages resulting from the suspension of production from the wells. *Id.* Meanwhile, the platform was destroyed by a

hurricane, and the parties stipulated that if reconstruction had proceeded, the wells would have been back in production after 130 days. *Id.* After the hurricane, the two wells previously in production were abandoned, but in 1966 the platform owners drilled into reservoirs previously tapped by the two wells as well as others that could have been tapped from the damaged/destroyed platform. *Id.*

A commissioner determined that plaintiffs' damages consisted of interest on a net production figure of $60,000, and the district court approved that amount. *Id.* at 392. The Fifth Circuit reversed. *Id.* at 393.

The court of appeals found that plaintiffs were entitled to their net profit of $60,000 and that this did not represent a double recovery, even though the oil was not lost. *Id.* at 392–93.

> The oil companies do not claim for lost oil or damage to oil as an asset. Their suit is for damages suffered as a consequence of the collision of the ship with the platform. Profit on oil production is simply one means of measuring the damages suffered. The plaintiffs have lost the use of their capital investment in lease, platform and producing wells for 130 days during which that investment was tied up without return. The fact that the same amount of profit can be made at a later time with the same investment of capital by removing from the ground a like quantity of oil at the same site does not alter the fact that plaintiffs are out of pocket on 130 days use of their investment.

*Id.* at 392.

The Fifth Circuit found that this concept of loss fit "squarely within the basic doctrine for marine collision of *restitutio in integrum*, as applied in many comparable situations." *Id.* Quoting *The Potomac*, 105 U.S. 630, 631, 26 L.Ed. 1194 (1881), the court of appeals compared the situation in *Electra* to that of a "vessel laid up for repairs." *Electra*, 431 F.2d at 392.[4]

> In order to make full compensation and indemnity for what has been lost by the collision, *restitutio in integrum*, the owners of the injured vessel are entitled to recover for loss of her use, while laid up for repairs. When there is a market price for such use, that price is the test

---

**3.** Defendants also agreed in the stipulation to pay the $910,000 settlement amount on or before thirty days after August 8, 1994.

**4.** The court of appeals quoted the following from *The Potomac:*

However, the Fifth Circuit left the hatch open, arguably, for at least one if not more than one theory of damages in vessel/platform allision cases. In a footnote, the court of appeals stated: "We need not consider whether lost profit or *a fair return on investment* is a better measure.... The only evidence before us is of lost profit. The shipowner has not asserted that the profit is excessive but has stood on the erroneous theory that profits are not recoverable at all, only interest on profits." *Id.* at 393 (emphasis added).

The Fifth Circuit revisited *Electra* in *Bolivar County Gravel Co. v. Thomas Marine Co.*, 585 F.2d 1306 (5th Cir.1978). In that case a barge had broken away from a tow and had collided with a dredge, damaging the dredge and making it inoperable for ten days while it was repaired. *Id.* at 1307. The dredge's owner sought recovery for cost of repair and replacement and loss of use. *Id.* On summary judgment, the district court held that plaintiff was entitled to recover for property damage only. *Id.* The Fifth Circuit affirmed. *Id.*

While the dredge was idle, the plaintiff supplied its customers with gravel from its existing stockpile, and the stockpile was replenished to the same level as prior to the collision within one month of the dredge's return to normal operations. *Id.* "There is no evidence that the plaintiff lost any sales, revenues, or potential customers, nor is there any evidence that it incurred any increased operating expenses." *Id.*

Plaintiff relied on *Electra* for its argument that it was entitled to damages for loss of use, arguing that it was "entitled to recover the net income it would have earned on the gravel it would have produced during the 10 days the dredge was inoperable." *Id.* at 1308. The Fifth Circuit rejected this argument.

The short answer to this argument is that, unlike the oil companies in [*Electra*], the plaintiff is not out of pocket anything by virtue of the lost production time. In [*Electra*], the oil companies were worse off after the accident than they had been before—they were 130 days behind in their production than what they would have otherwise been. Although they could eventually extract all the oil beneath the platform that it was profitable to extract, they would have to "stay on the site 130 days longer, with investment in place" in order to do so. The idling of their production for 130 days thus resulted in a tangible and concrete loss—the use for 130 days of the amount of the investment that was tied up in the platform. That is not the case here, however.

*Id.* at 1308–09.

The court found that because the gravel company was "apparently ... able to produce more than it could sell," it made up for lost production time. *Id.* at 1309. It was in the same position as if the accident had not occurred. *Id.* "Furthermore, it has not shown that the effort required to replenish the stockpile would have resulted in any expenses over what it would have otherwise incurred." *Id.*

Of even more importance for the present case is footnote 3 in *Bolivar County Gravel,* where the court of appeals stated:

> In [*Electra*], we did not hold that the loss was directly translatable into lost profits on 130 days worth of production. Rather, we stated that:
>
>> We need not consider whether lost profit or a fair return on investment is a better measure.... The only evidence before us is of lost profit....

*Id.,* n. 3. The court continued with the remainder of footnote 3 in *Electra* quoted completely above.

Although unpublished and of no precedential value per the Local Rules of the Fifth

---

of the sum to be recovered. Where there is no market price, evidence of the profits that she would have earned if not disabled is competent; but from the gross freight must be deducted so much as would in ordinary cases be disbursed on account of her expenses in earning it; in no event can more than the net

profits be recovered by way of damages; and the burden is upon the libellant to prove the extent of the damages actually sustained by him.

*Electra,* 431 F.2d at 392, quoting *The Potomac,* 105 U.S. at 631, 632.

Circuit,[5] the court of appeals' decision in *GEO–1966, Inc. et al. v. Shell Oil Company et al.*, No. 88–3433 (5th Cir. October 19, 1989) is at least instructive in that it reversed the district court's reliance on *Electra*, again noting the limitation of the *Electra* holding by its footnote 3. *Id.* at 11–12. The court noted that the defendant had presented evidence establishing damages on a "fair-market-return-on-investment formula" and believed "this is a more equitable basis for determining this element of damages in this case." *Id.* at 13.[6]

■ Thus, it is clear that in this Circuit the "net profits" method of calculating damages employed in *Electra* is not the only method that can be used. Calculation of damages based on "fair return on investment" also is appropriate. With this in mind, the Court reviews the evidence presented at trial.

### TRIAL TESTIMONY

Three witnesses testified. The first, William Hahne, an engineer with LLECO, testified as a fact witness as to the history of the platform and the wells at issue. He also testified that two of the wells, A–2 and A–5, appeared to be partial "water-drive" wells and that the third, A–4, appeared to meet the description of a "water-drive" well.[7]

Hahne also testified that plaintiffs were operating and selling gas from the wells at full capacity when the wells were shut-in and that plaintiffs had no excess capacity to make up for the gas not produced when the wells were shut-in. Further, he testified that

plaintiffs established a smaller reserve for each field from which the three wells produced after the allision.

Finally, Hahne testified that MMS, which was entitled to royalties pursuant to the lease of the field where the wells were located, had not been paid royalties during the shut-in period because there had been no revenue. Additionally, he testified that MMS had not made a claim for royalties. He further stated that he did not know whether MMS would make such a claim on any damages awarded for lost revenue during the shut-in period.

Plaintiffs' expert, Cheryl Collarini, testified as a reservoir and petroleum engineer and a petroleum economist. She stated that she was asked to estimate the value of production shut-in as a result of the casualty and, in doing so, reviewed the monthly production histories of the wells as well as gas prices. She opined that the gross production value lost during the shut-in period was $863,938.00 and the net value after deducting operating expenses was $766,018.00. Her opinion was based on the lost-profit method employed in *Electra*, and her calculation consisted of multiplying the amount of shut-in production from the three wells by her calculation of the price of gas. Her net calculations figure made no deduction for any royalty burden to MMS; neither did she offer any opinion on whether plaintiffs would owe such a royalty.

Collarini also testified that when water-drive wells are shut-in, the water continues to move up in the reservoir until the pressure

**5.** United States Court of Appeals for the Fifth Circuit, Local Rule 47.5

**6.** Also cited to the Court were two district court decisions, but both are distinguishable from the present case. In the first case, another section of this court found *Electra* to be applicable in a case involving an allision between a barge and a well, but that well was then plugged and abandoned. *Mobil Oil Exploration & Producing Southeast, Inc. v. Rebstock Towing Co. et al.*, C.A. No. 86–4532 c/w C.A. No. 87–456 and 86–4686 (E.D.La. December 12, 1988) (McNamara, J.) The wells in this case were not plugged and abandoned.

The second case is *PG & E Resources Offshore Co. et al. v. Zapata Gulf Marine Corp. et al.*, C.A. No. G–94–208 (S.D.Tex., Galveston Div., May 4, 1994), wherein the district court applied a "fair market return on investment" or "present value approach" instead of the *Electra* method. *Id.* at 8, 15. However, this Court does not find *PG & E* to be applicable because, unlike the present case, neither party in *PG & E* presented evidence on damages based on *Electra*. *PG & E*, at 8. As will be shown, plaintiffs in this case relied exclusively on *Electra* for their theory of recovery.

**7.** This witness testified that most reservoirs of gas in the Gulf of Mexico were driven by water. According to the testimony of plaintiff's expert, this means that when wells are drilled into reservoirs, water underlying the gas supplies the pressure to force the gas out of the well. Defendant's expert also testified as to another type of well, a "depletion-drive" well.

between the water and the gas in the reservoir equalizes, causing a loss in reserves of gas. In effect, the water rises such that less gas can be recovered. She testified that she was fairly certain that in regard to wells A–2 and A–5, there had been a loss of reserves, although there was limited information in regard to these wells to quantify such a loss in reserves. In support of this opinion, for example, she noted that in regard to well A–5 there was a severe drop in gas production following the allision, relying on Plaintiffs' Exhibit 7. She did not calculate the reserves, however. She testified on cross-examination that, although plaintiffs were not making a claim for reserves, she was giving her opinion in order to test the assumptions made by defendant's expert in his model for calculating damages.[8]

Finally, Collarini testified, in anticipation of defense testimony, that a discount figure of seven percent, representing the prime rate of interest plus one percent, was not an appropriate measure of return on investment. Instead, because these wells are what she described as "low-risk" wells, she testified that higher figures of 18 to 25 percent (or even higher) are more appropriate discount rates.

The defendant's expert, Bill R. Hise, testified with expertise in petroleum engineering, reservoir engineering, and economics of those fields. He stated that he was first contacted in July 1993 and was asked to determine the damage from the wells being shut-in. He reviewed numerous documents in reaching his calculations, although he agreed with the gas prices used by plaintiffs' expert in her calculations.

Hise testified that in this case only an interruption of production had occurred. As a result, he devised a method to calculate damages which he stated would put the lease operator in the same position had the casualty not occurred. This method was based on the use of present value. Hise determined the present value of future income from the three wells had no casualty occurred and also determined the present value of future income in view of the casualty. According to Hise, the difference between those two present values represented a proper measure of damages for a case where an interruption of production had occurred, not a total cessation of production as a result of a casualty.

On both direct and cross-examination, Hise testified that his method was not the same as the fair-return-on-investment method "but it gets to the same place." In essence, according to Hise, his methods compensates the plaintiffs for the delay in their return on investment.

Hise also testified that all three wells at issue also fit his model of a declining gas well where production is shifted forward "uniformly" over time. He opined that there was no deterioration of capacity of wells A–2 and A–5, the water-drive wells, as a result of being shut-in after the casualty such that they were unable return to production at their pre-casualty rates. Hise testified that, in regard to well A–2, he based this opinion on the shut-in tubing pressures, although he agreed with plaintiffs' expert that these were the least reliable indicators. He testified, however, that these were the only pressures available for comparison. In regard to well A–5, Hise testified that this well "made water" before the accident and the fact that it "made" a slight bit more water after the accident did not change his opinion that the well's capacity to produce was not lost.

In regard to the reservoir from which gas was taken by well A–4, Hise testified that this was a "classic depletion-drive reservoir," not a water-drive reservoir. He believed that the production of this well had come back after the casualty in January 1993 "reasonably" to where it had been in December 1992 and that there had been no deterioration of the well's capacity to produce as a result of its being shut-in.

Using these opinions, Hise formulated his damage calculation.[9] Hise first calculated the number of days off of production for each well as well as the estimated rate of produc-

---

8. Additionally, in plaintiffs' opposition memorandum to defendant's motion in limine, plaintiffs state that they do not make a claim in this suit for lost reserves. (Document 29.)

9. See Defendant's Exhibit 19.

tion had the wells been in production instead of being shut-in. Hise then figured the amounts of gas and condensate not produced by each well during the shut-in period, making two adjustments to this calculation. First, Hise adjusted his figures downward for any small amounts of production from each well during the shut-in periods. Second, he adjusted the figures downward again for the amount of royalty for gas and condensate due to the MMS. He testified that he calculated the royalty to be 16⅔ percent based on the lease.

Using the gas and condensate prices employed by plaintiffs' expert, Hise then multiplied his adjusted, or net, volumes of gas and condensate times the prices for gas and condensate. Hise then took the total figure for delayed net revenue for each well and, using a discount factor of 7 percent, which he testified was the prime rate plus one percent, discounted the delayed net revenue over his estimate of the remaining life of each well. He testified that he calculated the remaining life of each well from reports provided by plaintiffs as well as his own analysis of production reports from documents available to the public in regard to MMS lease production. Thus, Hise's calculation of the loss from the wells in present value of delayed net revenue was $48,324. He also testified that, using discount rates of 18 percent and 25 percent, which rates Collarini testified were more accurate in terms of return on investment in oil and gas production, his figure of present value of delayed net revenue would rise to $113,013 or $140,987, respectively.

On cross-examination, Hise agreed that the calculation of plaintiffs in regard to deferred production volumes was reasonable and that, as shown, he had no quarrel with Collarini's price assumptions.

He also agreed that his calculation of total delayed revenue net of royalty would increase, prior to discounting, to approximately $904,000 from approximately $754,000 if the royalty percentage were not factored in. This figure was approximately $40,000 more than Collarini's estimate of total delayed net revenue of approximately $863,000. He testified that he knew of one case where MMS had made a demand for royalty on an award of damages for deferred production.

Hise further testified that he did not figure the loss of reserves in this case for each well but only estimated the remaining life of the wells.

Finally, Hise testified that any type of rise in pressure in a water-drive reservoir, including the shut-in of a well, can make a reservoir susceptible to loss, but the degree to which the loss occurs depends on the circumstances involved.

## ANALYSIS

### A. Damages

■ Considering *Electra* and its progeny and, further, considering the evidence presented, the Court credits the method and testimony of defendant's expert in most respects. First, the Court finds credible Hise's testimony that his method and the fair-return-on-investment method reach the same end point, such that Hise's method is worthy of consideration under *Electra*. As defendant's expert points out, this is not a case where the wells were ultimately abandoned. The Court agrees that this is a case of deferred production, where the methodology employed by Hise, although not a fair-return-on-investment method, adequately and properly achieves the damages plaintiffs are due in this case.

However, the Court accepts Hise's analysis with two exceptions, for which adjustments must be made.

First, the Court disagrees with Hise's inclusion in his figures of the 16⅔ percent MMS lease royalty. Hise testified that he knew of one case where MMS has made a claim on an award for damages. Further, adjusting the damage award downward for the royalty percentage would not prevent MMS from pursuing plaintiffs for the lease royalty, either factually or legally, because MMS is not a party to this suit. If MMS would make a claim for royalty on a damage award, plaintiffs would not be protected by res judicata for MMS is not a party to this lawsuit. *See Nilsen v. Moss Point*, 701 F.2d 556, 559 (5th Cir.1983) (*en banc*) (one of requirements for

res judicata is parties must be identical in both suits). Therefore, in the interest of justice, the Court declines to decrease any damages due to plaintiffs by an amount equal to the royalty interest.

The second exception is that the Court rejects Hise's use of a seven percent figure as being too low and inconsistent with achieving the appropriate fair return on investment. Instead, the Court accepts Collarini's testimony that discount rates of 18 or 25 percent are more appropriate in figuring a fair return on investment for plaintiffs and concludes that the 25 percent figure is proper.

Thus, with these exceptions in mind, the Court accepts Hise's methodology of calculating damages. The methodology should be revised such that Hise's present value of delayed net revenue should not include any MMS royalty and should be calculated at a discount rate of 25 percent.

B. Prejudgment interest

█ Prejudgment interest is appropriate in this matter. The award of prejudgment interest "is the rule rather than the exception in maritime cases" unless peculiar circumstances exist. *Reeled Tubing, Inc. v. M/V Chad G*, 794 F.2d 1026, 1028 (5th Cir. 1986).

> Peculiar circumstances may be found where plaintiff improperly delayed resolution of the action, where a genuine dispute over a good faith claims exists in a mutual fault setting, where some equitable doctrine cautions against the award, or where the damages award was substantially less than the amount claimed by plaintiff.

*Id.* Such circumstances do not exist here. The only one of these circumstances that arguably could apply is the last one, but the damages award in this case is not due so much to plaintiffs' overvaluing the case as it is to the Court's decision to adopt one of two rival recovery theories. Indeed, the Court believes that prejudgment interest, calculated from the date of loss, properly compensates plaintiffs and is consistent with the fair-return-on-investment theory.

Further, this Court finds that prejudgment interest should be calculated at a rate to be determined in accord with 28 U.S.C. § 1961. Again, the Court believes that such a rate is consistent with awarding plaintiffs' damages in accord with a fair return on their investment. *Reeled Tubing*, 794 F.2d at 1029–30.

### CONCLUSION

Based on the foregoing, the Court holds that plaintiffs are entitled to damages in an amount to be determined according to the analysis of defendant's expert, as adjusted upward by deleting any factor for the MMS royalty and by using a discount rate of 25 percent.

As stated, in reaching this decision, the Court is mindful not only of *Electra* but also the court of appeals' notation that lost profits are not necessarily the "better measure" of damages. As revised by the Court, the defendant's method achieves the "better measure" and satisfies that goal more adequately than the net lost-profit method proposed by plaintiffs. Additionally, the award of prejudgment interest aids in reaching the goal described in *Electra* as *restitutio in integrum*.

The parties are directed to submit an agreeable form of judgment to be entered consistent with this opinion. Such submission shall in no way necessarily constitute acquiescence in this opinion or prejudice any party from exercising any right of appeal.