United States Court of Appeals,

Fifth Circuit.

No. 95-30008.

NERCO OIL & GAS, INC., et al., Plaintiffs,

Agip Petroleum Co., Inc. and Lleco Holdings, Inc., Plaintiffs-Appellants, Cross-Appellees,

v.

OTTO CANDIES, INC., et al., Defendants,

Otto Candies, Inc., Defendant-Appellee, Cross-Appellant.

Feb. 14, 1996.

Appeals from the United States District Court for the Eastern District of Louisiana.

Before REAVLEY, HIGGINBOTHAM and BARKSDALE, Circuit Judges.

REAVLEY, Circuit Judge:

On November 7, 1992 an allision occurred between the M/V Hatty Candies, owned by Otto Candies, Inc., and an offshore oil and gas platform owned by Nerco Oil & Gas, Inc. and Agip Petroleum Co. Nerco's assets were later purchased by LLECO Holdings, Inc. As a result of the accident, three of the wells on the platform were shut-in for between 31 and 50 days. The parties settled all claims of actual damages to the platform, and tried to the district court the measure of damages for the resulting shut-in of the three wells. The district court awarded damages based upon Candies' expert's estimation of loss, and specifically rejected the platform owner's "lost profits" calculation of damages. *LLECO Holdings, Inc. v. Otto Candies, Inc.,* 867 F.Supp. 444, 450-451 (E.D.La.1994). The district court's award also included royalty payments

1

potentially owed by the platform owners to the U.S. Mineral Management Service. *Id.* at 451. Both parties appeal.

We are initially asked to resolve the question of whether "lost profits" is the proper measure of damages when an offshore well is shut-in as the result of an allision. Our review of the district court's legal conclusions is de novo. *Dow Chemical Co. v. M/V Roberta Tabor,* 815 F.2d 1037, 1042 (5th Cir.1987). We review the factual findings under the clearly erroneous standard. *Id.*

## I.

We begin with the legal measure of damages and our decision in *Continental Oil Co. v. SS Electra,* 431 F.2d 391 (5th Cir.1970), *cert. denied,* 401 U.S. 937, 91 S.Ct. 925, 27 L.Ed.2d 216 (1971). In a similar allision, the S.S. Electra collided with an offshore oil platform owned by Continental in the Gulf of Mexico. No oil was lost in the accident. However, the damage to the platform was severe and production was halted. The parties stipulated that the net income which would have been realized during the shut-in was $60,000. The district court in *Electra* awarded Continental interest on the $60,000 for the 130 day shut-in period as damages. We rejected this measure of damages because it did not properly award Continental for its return on investment. We stated:

> The [platform owners] have lost the use of their capital investment in lease, platform and producing wells for 130 days during which that investment was tied up without return. The fact that the same amount of profit can be made at a later time with the same investment of capital by removing from the ground a like quantity of oil at the same site does not alter the fact that the [platform owners] are out of pocket a return on 130 days of use of their investment. Presumably the oil companies ultimately will produce from the reservoir all the oil that is economic to produce, but, as the District Court

2

> pointed out, it will require 130 days longer to do so. The [platform owners] must stay on the site 130 days longer, with investment in place, than necessary but for the ship's negligence.
>
> This is no theoretical, shadowy concept of loss. It is squarely within the basic damage doctrine for marine collision of *restitutio in integrum,* as applied in many comparable situations.

*Electra,* 431 F.2d at 392. The doctrine of *restitutio in integrum,* strictly construed, would limit damages to the difference in the value of the vessel before and after the collision. *Delta Marine Drilling Co. v. M/V Baroid Ranger,* 454 F.2d 128, 129 (5th Cir.1972). Under this theory of recovery, the owners of an injured vessel are often entitled to recover for the loss of the vessel's use, while laid up for repairs. *The Potomac,* 105 U.S. 630, 26 L.Ed. 1194 (1882); *Electra,* 431 F.2d at 392. The recovery of loss of earnings has often depended upon the circumstances of the accident. Where the accident victim can show no loss of income, the courts have not awarded damages. *Brooklyn Eastern Terminal v. United States,* 287 U.S. 170, 53 S.Ct. 103, 77 L.Ed. 240 (1932) (plaintiff's two tugs did the same work as the three had done before one was damaged); *Bolivar County Gravel Co. v. Thomas Marine Co.,* 585 F.2d 1306, 1309 (5th Cir.1978) (gravel company was in same position as before the accident to its dredge and had lost no sales because stockpile of gravel was replenished after repairs to dredge). Where loss of earnings was shown the plaintiff has been permitted to recover. *Delta Marine,* 454 F.2d at 130 (oil platform's contract with oil company required payment of $4,300 per day while drilling and $3,500 per day for time in tow or in

repair). In this case Nerco/LLECO and Agip were not able to produce oil from other wells to make up for the loss of their three wells. Nevertheless, the platform owners lost no oil or gas because of the accident. The true damage to the platform owners as acknowledged in *Electra* is that they will be required to remain at the site longer than expected to recover the oil and gas.

The court in *Electra* rejected the district court's measure of damages and chose the alternative measure of "lost profits" proposed by Continental. In a footnote the *Electra* court limited the holding by noting that because the only evidence before the court was of lost profit, the court did not have to consider whether a fair return on investment would be a better measure of damages. 431 F.2d at 393 n. 3. Contrary to the platform owner's position, our holding in *Electra* did not determine that "lost profits" was the required measure. We only determined that it was one measure of damages and that it was a better measure than interest on lost profits.

Candies' expert, Hise, testified as to the value of the platform owner's loss. He testified that only an interruption of production occurred in this case. Hise estimated what the monthly net revenue of the platform over the life of production would have been had no accident occurred. He also estimated the monthly net revenue of the platform during the life of production after the shutdown due to the accident. Both estimations were discounted to present value, and the difference constituted what Hise determined was the loss to the platform owners as a result of the allision.

4

The post-collision value necessarily factors in the additional time necessary to recover all oil and gas from the reservoir, the loss of cash flow during the shut-in period, and the monthly delay in receiving revenue over the life of the well as a result of the accident.

The platform owners argue that the magnitude of the discrepancy between "lost profits" ($766,018.00) and the actual award ($140,987.00) are not "in the same ballpark" which indicates that Hise's calculations must be incorrect. This evidence could just as easily demonstrate how excessive the "lost profits" measure of damages is, when compared to the owners' real loss.

The platform owners also argue that Hise's opinion and his calculations are not the "fair return on investment" contemplated in *Electra.* The expert acknowledged that his methodology was different, but Hise testified that his method came to the same point as a fair return on investment. Nevertheless, it is important at this juncture to note that the platform owners offered no other method of calculation for the fair return on investment. Rather, their position before the district court was that they were entitled to their computation of lost profits.

We agree with the district court that Hise's methodology is a better measure of the platform owner's loss than the platform owners' sum of "lost profits."

## II.

The platform owners also argue the district court was clearly erroneous in adopting several of Hise's factual assumptions. They

contend the price of gas forecasted by Hise has since been proven not to be true;  gas reserves were actually lost during the shut-in;  and finally, the diagram Hise used to explain his model does not correspond with the evidence.  The platform owner's complaint concerning the decrease in the price of gas in the spot market is based upon changes in the market after the district court's judgment.  There was no objection to Hise's price forecast at trial, and we are not inclined to take "judicial notice" of the speculative spot market price for gas and recalculate damages.  The district court was not clearly erroneous in accepting Hise's estimation of future gas prices.

The platform owner's arguments concerning Hise's model and the lost oil and gas are contingent upon a finding of actual loss or leakage of reserves.  Both arguments require an estimation on the part of the platform owners to prove their oil or gas losses. *See Bolivar,* 585 F.2d at 1308 n. 2 (burden of establishing that profits were lost is upon the plaintiff);  *Skou v. United States,* 478 F.2d 343, 345 (5th Cir.1973) (same).  There was no proof that the platform owners suffered a loss of oil or gas during the shutdown.  Their own expert testified that she was not hired to determine whether reserves were lost.  A week before trial during her deposition she testified that there was no loss.  Before trial, the platform owners filed a motion in limine in which they recognized that they were not seeking damages for lost oil or gas. *LLECO,* 867 F.Supp. at 449 n. 8.  At trial their expert indicated that gas or oil reserves were lost, but she could not estimate that

loss.  We do not believe the trial court was clearly erroneous in adopting Hise's assumptions.

## III.

In Candies' cross-appeal, it asserts that the district court was clearly erroneous in not deducting the United States Mineral and Mining Service (M.M.S.) royalty in its computation of monthly revenue during the shutdown.  In his original net revenue estimate, Hise deducted as an expense the M.M.S. royalty.  The district court, however, required Hise to recalculate those figures without the expense deduction.  The district court's reasoning for not including this expense was based on the premise that after the suit the platform owners may be forced to pay the M.M.S. royalty on the award.  The district court's decision was based upon speculative testimony.  Hise testified that he had heard of one case in which the M.M.S. had sought royalty payments on a court recovery for shut-in time.  He was unaware of whether the M.M.S. actually recovered.

The platform owner's oil and gas lease requires them to pay a royalty of 162/3% in amount or value of "production saved, removed or sold from the lease area."  We have defined the word "production," as "the actual physical severance of minerals from the formation."  *Diamond Shamrock Exploration Co., v. Hodel,* 853 F.2d 1159, 1168 (5th Cir.1988).  Therefore, under this lease, the M.M.S. would not be entitled to a royalty until "production."  No physical severance of oil or gas occurred during the "shut-in" period.  Because the testimony concerning the M.M.S.'s desire to

7

seek royalty in the "shut-in" case is speculative, and because the lease indicates the M.M.S. would not be entitled to such a royalty, we believe the district court was clearly erroneous in including the royalty payments in its award. The lease between the platform owners and the M.M.S. does require a minimum royalty payment of $3.00 per acre per year to maintain the lease. We presume that the actual royalty payments paid during the year of the accident were in excess of the minimum royalty due, but if not, Candies will be responsible for a portion of that cost. Therefore, we remand the case to the district court to modify the award to correct the M.M.S. royalty reimbursement.

## IV.

The district court's judgment is vacated and the case is remanded for modification of the amount of recovery.

VACATED and REMANDED.