# UNITED STATES COURT OF APPEALS

## FOR THE FIFTH CIRCUIT

_____

No. 95-30740

_____

CHEVRON PIPE LINE COMPANY;
CHEVRON U.S.A., INC.,

Plaintiffs-Appellees/
Cross-Appellants,

versus

JOHN E. CHANCE AND ASSOCIATES, INC.;
LLOYDS UNDERWRITERS OF LONDON,

Defendants-Appellants/
Cross-Appellees.

_____

Appeal from the United States District Court
For the Eastern District of Louisiana
(90-CV-3770)

_____

February 10, 1997

Before POLITZ, Chief Judge, WIENER and BARKSDALE, Circuit Judges.

POLITZ, Chief Judge:[*]

A pipeline rupture and oil spill resulted in this litigation between Chevron

_____

   [*] Pursuant to Local Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in Local Rule 47.5.4.

Pipe Line Company (CPL) and Chevron U.S.A., Inc. against John E. Chance & Associates, Inc. and certain underwriters at Lloyd's London, and London Companies. The appeal and cross-appeal relate solely to damages. For the reasons assigned we affirm in part and vacate and remand in part.

## Background

On the night of September 18, 1989, a pipeline owned by CPL was ruptured during a dredging operation, causing 300 barrels of crude oil to spill in the Bayou Casotte ship channel near Pascagoula, Mississippi. Chance & Associates had marked the location of the pipeline incorrectly. Escaping oil reached the beach of nearby Horn Island, a national refuge area.

The 20-inch common carrier crude oil pipeline extends 105 miles from Empire, Louisiana to a Chevron refinery in Pascagoula, traversing the Bayou Casotte ship channel near Pascagoula. The bayou needed dredging and the U.S. Army Corps of Engineers hired C.F. Bean Dredging to perform that service. It was necessary that the location of the pipeline be marked carefully. Chance was hired to survey and mark the pipeline, doing so in the presence of an assigned CPL employee. After a bench trial before a magistrate judge by consent under 28 U.S.C. § 636(c), the court found that because of the error in the marking, Chance and CPL were each liable, in contract and tort, for 50% of the loss. Negligence of the CPL

2

employee was imputed to Chevron.

The pipeline supplements the refinery's oil supply, the great bulk of which is delivered by tanker through the Bayou Casotte ship channel.

A day or so following the break in the pipeline CPL contractors made temporary repairs. Permanent repairs were completed by October 4, as was the cleanup operation.

Because of the interruption in the pipeline flow and the closure of the ship channel for repairs Chevron claimed a loss for reduced production in the amount of $6,370,000 and $4441 for lost oil. The court awarded the $4441 claim for lost oil and $349,191 for the claimed loss of production. CPL sought and recovered $663,975 in pipeline repair costs and $1,119,811 in oil spill cleanup expenses. The court also awarded unspecified prejudgment interest. Chance appeals; CPL and Chevron cross-appeal various elements of the award.

## Analysis

This action arises under admiralty jurisdiction and federal law governs the damages issues.[1] We review factual findings for clear error and legal conclusions *de novo*.[2] As is the norm in actions in tort and for contractual breach, the plaintiffs

---

[1]**Pizani v. M/V Cotton Blossom**, 669 F.2d 1084 (5th Cir. 1982).

[2]**Nerco Oil & Gas, Inc. v. Otto Candies, Inc.**, 74 F.3d 667 (5th Cir. 1996).

bear the burden of proving the specifics of each item of claimed damages.

1. Salaried employees.

Chance first contends that the district court erred in awarding compensation for the time of salaried CPL and Chevron employees who participated in the repair and cleanup. Chance maintains that where, as here, an injured party hires outside contractors to conduct repair work, the injured party cannot be compensated for its own overhead. Chevron and CPL respond that the loss of the employees' productivity is compensable because they had other work to do.

Acknowledging Chance's argument, the trial court made general findings that the Chevron cleanup efforts were commendable, that CPL and Chevron made downward adjustments to their claim for cleanup and repair expenses, and that the expenses were reasonable.

In **Freeport Sulphur Co. v. S/S Hermosa**,[3] we held that the time of salaried employees engaged in repairs can be a legitimate element of a damages award in an admiralty case. The obvious purpose of compensatory damages is to place the injured party, as nearly as possible, in the position it would have been if the wrong had not occurred. When an injured party uses its own labor to perform repairs, its overhead is recoverable because a contractor hired to perform the repairs typically

___

[3] 526 F.2d 300 (5th Cir. 1976).

would have charged for overhead.[4]  **Freeport Sulphur**, however, relied in part on evidence that the salaried employees would have been doing other productive work if they had not been required to do the repair work.  Where the duties of a salaried employee include the work for which the employer seeks recovery, and there is no evidence presented that the employee was unable to perform the other duties, the time of the employee is not compensable.[5]  Furthermore, where repairs are made by a third party, the salaries of management or administrative employees of the injured party should not be considered a cost of repairs.[6]

Chevron and CPL contracted with more than 15 companies to clean up the oil spill and repair the pipeline.  A Chevron employee testified that $53,000 in time of salaried Chevron employees was claimed, including the time of supervisors; administrative, accounting and environmental staff; accountants; operators; operating assistants; and process engineers who participated in the cleanup. A CPL employee testified that its claim for repair expenses included the time of CPL engineers, as well as seven or eight salaried employees who were on site to

---

[4]**United States v. Peavy Barge Line**, 748 F.2d 395 (5th Cir. 1984) (citing **Freeport Sulphur**).

[5]**Creole Shipping Ltd. v. Diamandis Pateras, Ltd.**, 410 F.Supp. 313 (S.D.Ala. 1976), aff'd, 554 F.2d 1348 (5th Cir. 1977).

[6]**Pelican Marine Carriers, Inc. v. City of Tampa**, 791 F.Supp. 845 (M.D.Fla. 1992) (citing **Freeport Sulphur**), aff'd, 4 F.3d 999 (11th Cir. 1993).

supervise the repairs even though the contractors also had supervisors there. Neither Chevron nor CPL offered evidence reflecting whether: (1) the job responsibilities of salaried employees included participation in repairs and accident cleanup, (2) any work performed was necessary and nonduplicative of the work of the contractors, and (3) the repair and cleanup responsibilities deterred their performance of other productive work.

We must conclude that as a matter of law compensation for the time of salaried administrative and supervisory staff cannot be granted. Contractors performed the repair work; recovery for the overhead expenses of the injured parties would be duplicative. Further, the claim for time of other salaried employees herein must be disallowed for lack of evidence that their efforts were not duplicative of the contractors' work and that actual employee productivity was lost.

On remand the $53,000 allowed for the time of salaried employees of Chevron must be deducted from the damages award. There being no quantification of the amount awarded for CPL salaried employees in the record, briefs, or oral argument, on remand this amount must be determined and deducted from the award.

2. Down time of dredge and vessel.

Chance also appeals recovery for the down time of two vessels, the dredge owned by Bean and the AMERICAN EXPLORER, which was used to perform permanent repairs to the pipeline.

CPL made two payments to Bean -- $26,667 for use of its dredge in the temporary repairs, and $79,600 for down time caused by the interruption of the ongoing dredging project. The CPL engineer-in-charge of cost control for the repairs testified that a high-powered suction dredge was necessary for removal of the pipeline cover to patch the pipeline and stop the oil leak. The Bean dredge was on site and the engineer believed that bringing in a dredge from another site would not be cost-effective. He therefore agreed to pay Bean for down time of its dredge.

Chance disputes these facts and contends that this payment was gratuitous because the Chevron companies had no contract with Bean and no obligation to compensate Bean for its inability to earn money during the interruption in the dredging project.

An injured party is precluded from recovering for damages caused by its unreasonable conduct after the accident.[7] The tortfeasor, however, has the burden

---

[7]**Tennessee Valley Sand & Gravel Co. v. M/V Delta**, 598 F.2d 930 (5th Cir. 1979), modified in part, 604 F.2d 13 (5th Cir. 1979).

of proving that the injured party failed to minimize damages by demonstrating that its post-accident conduct was unreasonable and aggravated the losses.[8]  In determining whether the conduct of the injured party was reasonable, we must consider whether the decisions were made in times of crisis, ever mindful that we should allow the injured party appropriate latitude in its determination of how best to deal with an emergency situation.[9]

Although the trial court did not make specific findings of fact on this issue, it found that the repair costs as a whole were reasonable and that Chevron's decisions relative to containing the oil spill were made in an emergency setting and with a view toward preventing environmental damages to the Horn Island national refuge.  The magistrate judge extensively questioned the expert tendered by Chance about his basis for disputing the $79,600 payment.  On the record before us, and in view of the atmosphere of crisis in which the decisions were made, we are not persuaded that the award for this payment was in error.

Chance also disputes the award of $116,161 to CPL for seven to eight days of standby time of the AMERICAN EAGLE, a large vessel needed for permanent repair of the pipeline.  The trial court found that the AMERICAN EAGLE was used

---

[8]**Marathon Pipe Line Co. v. M/V Sea Level II**, 806 F.2d 585 (5th Cir. 1986).

[9]**Tennessee Valley Sand & Gravel**.

as a standby vessel in case the temporary patch failed, and that CPL's payment for that standby time was reasonable. Chance contends that CPL failed to mitigate its damages by unreasonably releasing the PIPELINE SURVEYOR, a smaller, less expensive vessel used in the temporary repairs, and by placing the AMERICAN EAGLE on standby.

We find no clear error in the trial court's conclusion that Chance failed to prove the unreasonableness of this payment. The CPL engineer-in-charge of cost control on the repair testified that: (1) the AMERICAN EAGLE was docked in Pascagoula at the time of the temporary repairs, (2) because the ship originated in Louisiana, additional mobilization charges would have been incurred had CPL not retained the ship, (3) the decision to retain the ship was made after investigating the availability of other vessels, (4) the AMERICAN EAGLE had the crane and deck size necessary to perform the permanent repairs, and (5) preparation work was necessary before the permanent repairs could be done. Again, we are mindful that the decision to retain the AMERICAN EAGLE was made during an emergency situation resulting from the oil spill.

3. Allegedly unsubstantiated expenses.

Chance contends that $55,888 of the award for repair expenses and $93,044 of the award for cleanup expenses are wholly unsubstantiated. Chevron responds

that "nearly all" of the disputed items are fully supported by the evidence, relying on sweeping testimony that CPL and Chevron used detailed accounting procedures to verify each charge by outside contractors. Finding that the claims for repair and cleanup expenses were reasonable, the trial court awarded the total amount requested making no factual findings about these disputed sums.

Without evidence specific to each charge for which recovery is sought, essentially advisory testimony that a reliable accounting system was used to verify charges will not suffice to prove compensatory damages. Of the disputed charges awarded to CPL for repairs, $17,364.64 for "marine equipment usage" is unsubstantiated. This amount must be deducted from the award. We do find, albeit sometimes sketchy, testimonial or documentary evidence in support of the other disputed repair charges. Accordingly, we cannot say that the award of compensation for those expenses is clearly erroneous.

Of the disputed charges awarded to Chevron for cleanup we must exclude $11,638 for materials or equipment unrelated to cleanup. Chevron's expert testified that certain expenses for equipment not normally used in cleanups should have been deducted. Chance's expert quantified these expenses. Chevron did not prove that the materials were used in the cleanup.

The Chevron expert also testified that its claim included nonconsumable

10

purchases with continued value, which he recommended be excluded or given to Chance. The Chance expert quantified these expenses at $32,507. In keeping with the goal of placing the injured party as nearly as possible in the position that would have been occupied had the wrong not occurred, we must deny recovery of repair costs beyond what is necessary to restore property to its pre-accident condition.[10] Because Chevron failed to show that these nonconsumable items lack continuing value, $32,507 must be deducted from the award.[11]

4. Economic loss.

Claims for economic loss in admiralty cases must be proved with reasonable certainty.[12] The trial court based its award of $349,191 for economic loss on the testimony of an oil refinery economics expert tendered by Chance that the pipeline rupture caused a delay in producing 240,000 barrels of oil but did not cause a permanent loss of production. The compensation awarded was for loss of use of those funds during the period of delay. The court rejected Chevron's contention that the Pascagoula refinery always operated at maximum capacity and was

---

[10]**Pizani**; **Freeport Sulphur**.

[11]We find no clear error in the award of $23,000 for rental of a skimmer for the cleanup which did not have to be used because the oil did not move back into shallow waters, or in the award of $25,647 for equipment and materials lost or damaged in the cleanup.

[12]**Dow Chemical Co. v. M/V Roberta Tabor**, 815 F.2d 1037 (5th Cir. 1987).

incapable of compensating for production interruptions. Relying on documentary evidence and an assessment that Chance's expert testimony was more credible than Chevron's, the court found that the refinery had the capacity to make up for decreases in production and that it did so after the pipeline rupture by operating at its highest levels ever in October and November of 1989.

Chance challenges the award for economic loss on the grounds that Chevron failed to prove that it sustained any financial losses due to the pipeline rupture. On cross-appeal, Chevron contends that the trial court erred in finding that production was made up after the accident. Chevron seeks compensation for lost sales of the product it contends that it was unable to manufacture during the pipeline shutdown.

We find an adequate basis in the record for the trial court's conclusion that Chevron had the ability to compensate for the decrease in production and did so. In addition to our review of the documentary evidence, we give the deference which reason dictates that we must to the trial judge's assessment of the credibility of witnesses.

We are persuaded, however, that the court erred in awarding any damages for economic losses for production delays. To prove economic loss from a production decrease, an injured party must show that it was unable to substitute for lost production or that the substitution resulted in a net loss. The record contains

12

no such acceptable evidence.

Chevron stipulated that it lost no contract sales as a result of the pipeline rupture but contended that it lost sales on the spot market. The proof of loss of sales was confined to the testimony of two employees that all of the Pascagoula refinery products that would otherwise have been made during the period of decreased production would have been sold on the spot market.

Chevron failed to prove inability to substitute product to cover spot market opportunities during the period in which production at the Pascagoula refinery was reduced. A management witness testifying on behalf of Chevron, in a Fed.R.Civ.P. 30(b)(6) corporate deposition entered into the record, acknowledged that Chevron refineries often experience upsets causing decreased production. He testified that Chevron compensates for these upsets in a variety of ways, including exchange agreements with other oil companies in which they supply Chevron with finished product and are paid back with Chevron's product after the reduced production has been made up. He also testified that Chevron sometimes finds it profitable to buy and resell finished product on the spot market. The trial court made a factual finding rejecting the contention that Chevron's refineries were incapable of making up for reduced production. Chevron made no showing that it could not cover spot market opportunities by increasing production at another of its refineries during the

13

Pascagoula upset. Finding a complete failure of proof that Chevron was unable to substitute product during the relevant period, we must conclude that the economic losses alleged are speculative and have not been proved with the requisite certainty. Therefore, on remand the $349,191 awarded must be deducted from the final computation.

5. Prejudgment interest.

Chance contends that the award of prejudgment interest was inappropriate for four reasons: (1) the plaintiffs waited a full year to bring this action, (2) they caused substantial litigation delays, (3) the damages award was substantially less than the claim, and (4) the factual issues in the case were extremely complex.

As a general rule, prejudgment interest should be awarded in maritime tort cases to compensate for the loss of use of funds from the time the claim accrues until judgment is entered.[13] That presumption has been strengthened by **City of Milwaukee v. Cement Division, National Gypsum Co.**, in which the Supreme Court recently limited a trial court's discretion to deny prejudgment interest.[14]

Whether peculiar circumstances exist that would allow the trial court to

---

[13]**Reeled Tubing, Inc. v. M/V CHAD G**, 794 F.2d 1026 (5th Cir. 1986).

[14] 115 S.Ct. 2091 (1995) (genuine dispute over liability in a mutual fault setting cannot justify denial of prejudgment interest).

consider denying prejudgment interest is a fact issue reviewed for clear error.[15]

Even if an appellant can demonstrate that a finding of no peculiar circumstances is clearly erroneous, there remains the formidable hurdle of showing an abuse of the discretion created by the peculiar circumstances.[16]

In the case at bar, the trial court explicitly considered Chance's arguments and rejected them, finding that CPL and Chevron had no control over some of the factors leading to trial delays and that the equities favored the award of interest. Our review of the record persuades that the award of prejudgment interest was well within the court's discretion. The court, however, did not specify the interest rate. We conclude that the interest to be paid is the rate set forth for postjudgment interest in 28 U.S.C. § 1961.[17]

In accordance with the foregoing analysis, we AFFIRM in part, VACATE the portion of the trial court judgment setting damages, and REMAND for a recasting of the damages award consistent herewith.

---

[15]**Corpus Christi Oil & Gas Co. v. Zapata Gulf Marine Corp.**, 71 F.3d 198 (5th Cir. 1995).

[16]**Id.**; **Noritake Co. v. M/V Hellenic Champion**, 627 F.2d 724 (5th Cir. Unit A 1980).

[17]See **Reeled Tubing** (the rate provided for postjudgment interest in 28 U.S.C. § 1961 is one appropriate measure of prejudgment interest).